\*LEEPER  v.  STATE.

(*Knoxville.*  November  15,  1899.)

1. " UNIFORM TEXT-BOOK ACT."  *Constitutional.*

Acts 1899, Ch. 205, commonly known as the " Uniform Text-book
Act," which authorizes the selection and adoption, through a
commission, of a uniform series of text-books for the public
schools of the State, and provides for conveniently furnishing
same to patrons at reasonable prices, and for the enforcement,
under penalties, of the use in the public schools of the particu-
lar books adopted is a constitutional and valid statute.  (*Post,
pp. 504–537.*)

Act construed: Acts 1899, Ch. 205.

2. SAME.  *Monopoly and special privileges.*

That feature of the " Uniform Text-book Act " of 1899 does not
render it obnoxious to the constitutional provisions against
monopoly and special class legislation which authorizes a
commission appointed by the Governor to select and adopt a
uniform series of text-books for the public schools of the State,
and to contract with the publisher or publishers who will fur-
nish the books cheapest to provide and sell them at fixed prices
to patrons of the schools, and which provides further for the
enforcement, under penalties, of the use in the public schools
of the particular books thus adopted.  (*Post, pp. 511–519.*)

Constitution construed: Art. I., §§ 8, 22; Art. XI., § 8.

Act construed: Acts 1899, Ch. 205.

Cases cited: Memphis v. Memphis Water Co., 5 Heis., 529.

3. SAME.  *Same.*

The privilege which a publisher acquires under a contract with
the State to furnish the patrons of the public schools with a
uniform series of text-books, to be used therein, is not of a
monopolistic nature, where the purchaser obtains that privi-
lege in open and free competition with all other publishers,

---

\* The authorities respecting the adoption of text-books for public schools are re-
viewed in a note to Campana v. Calderhead (Mont.), 36 L. R. A., 277.

Leeper *v.* State.

by consenting to furnish the books at a less price than others. If this be a monopoly, it is one for the benefit of the State and its citizens, and not prohibited by the Constitution. The monopoly prohibited by the Constitution is a privilege farmed out to the highest bidder or conferred because of favoritism to the donee, and not one awarded to the lowest bidder or for the convenience and benefit of the public. (*Post, pp. 518, 519.*)

4. SAME. *Same.*

Persons who avail themselves of the benefit of the public schools have no just cause to complain of any infringement of their freedom to contract, if the State, that establishes and maintains the schools, prescribes a uniform series of text-books for its schools, procures and designates a publisher to furnish them at the lowest price obtainable, and compels the use of these particular books in its schools to the exclusion of all others. The right of the citizen to purchase any books he may choose on the open market cannot avail him to force the books of his choice into the schools maintained by the State. (*Post, pp. 514–518.*)

Cases cited: Transportation Co. *v.* Bloch, 86 Tenn., 392; Marr *v.* W. U. Tel. Co., 85 Tenn., 529; Coleman *v.* Satterfield, 2 Head, 264; Taylor *v.* Taylor, 12 Lea, 490; Truss *v.* State. 13 Lea, 311; Dugger *v.* Ins. Co., 95 Tenn., 245.

5. SAME. *Contract valid though State is not bound.*

Although the State does not bind itself by the contract with the publisher to furnish text-books to the patrons of the public schools the contract is nevertheless valid and binding upon the publisher, and inures to the benefit of the patrons. (*Post, pp., 519, 520.*)

Case cited: 5 Sawyer, 502.

6. SAME. *Stipulation that prices shall be as low here as elsewhere.*

The stipulation in the contract that the publisher has never furnished, and is not now furnishing. the same books to any State, county or school district at a less price, where like conditions prevail as in this State, and under this contract, is not too indefinite for enforcement. (*Post, pp. 520, 521.*)

7. SAME. *Cash purchases.*

The provision in the statute and contract that the purchaser shall pay cash for books in certain cases is a reasonable and valid one. (*Post, pp. 522, 523.*)

Leeper *v.* State.

8. SAME. *Does not delegate legislative power.*

The "Uniform Text-book Act" of 1899 does not delegate legislative power—*i. e.*, the power to enact and repeal statutes—but only confers administrative or executive functions, by its provisions for a commission to select text-books for the schools, to make contracts for obtaining them, and to arrange and perfect details of plans for delivery of books to patrons at lowest price obtainable, and, in connection with the Governor, to announce when everything is ready for the operation of the schools under the Act. The Act, by its terms, goes into effect from its date, and is not, therefore, put into effect by any act of the Governor or commission. The arrangement of details, under the Act, is such as is usually and necessarily left to a commission or other public agent. It is impossible of direct performance by the Legislature. (*Post, pp. 523–526.*)

9. SAME. *Local government.*

The "Uniform Text-book Act" of 1899 denies no just measure of local self-government to the people. The people have no inherent right to administer their local school affairs as each county or district shall deem right and proper. No such right is conferred by the Constitution. The establishment and regulation of public schools are legislative functions. The legislative power, in this regard, is practically unlimited and is not exhausted by exercise. It may abolish old systems and inaugurate new ones at its pleasure. (*Post, pp. 527–533.*)

Constitution construed: Art. XI., § 12.

10. SAME. *School fund.*

The fact that a portion of the funds to maintain the public schools may be derived from taxes levied by the counties does not wrest the public schools from such regulation and control by the Legislature as is provided in the "Uniform Text-book Act" of 1899. (*Post, pp. 530–533.*)

11. SAME. *Legislative power.*

The power of the Legislature to regulate and control the public schools is based upon the police power and the right of the State to regulate institutions charged with a public use. (*Post, pp. 514–516.*)

12. CONSTITUTIONAL LAW. *Must point out clause violated.*

The principle is reaffirmed and illustrated that he who assails

Leeper *v.* State.

. the constitutionality of a statute must put his finger on the specific provision of the Constitution which it, expressly or by necessary implication, violates. (*Post, p. 510.*)

13. SAME. *General assault on statute unavailing.*

The principle is reaffirmed and illustrated that a statute cannot be "invalidated upon some supposed or assumed natural right or equity; nor upon the general statement that it is opposed to the inherent rights of freemen; nor upon any spirit supposed to pervade the Constitution not expressed in words; nor because it is opposed to the genius of a free people; nor upon any general or vague interpretation of a provision beyond its plain and obvious import." (*Post, pp. 510, 511.*)

Cases cited: Bell *v.* Bank, Peck, 269; Hope *v.* Deadrick, 8 Hum., 8; Demoville & Co. *v.* Davidson County, 87 Tenn., 220; Davis *v.* State, 3 Lea, 277; Stratton *v.* Morris, 89 Tenn., 497; Luehrman *v.* Tax. Dist., 2 Lea, 438; Reelfoot Lake *v.* Dawson, 97 Tenn., 159; Henley *v.* State, 98 Tenn., 683.

14. POLICE POWER. *Scope.*

The scope and meaning of the term "police power" has never been defined. It extends to the health, morals, safety, peace, order, comfort, convenience, and general well-being of the public; but this enumeration of the objects for which it may be exercised is not complete. (*Post, pp. 531, 532.*)

Cases cited: Smith *v.* State, 100 Tenn., 505; Harbison *v.* Knoxville Iron Co., *post,* p. 421.

---

### FROM BLOUNT.

---

Appeal in error from Circuit Court of Blount County. JOS. G. PARKS, J.

H. A. MANN, E. E. HOUK, T. B. TURLEY, INGERSOLL & PEYTON for Leeper.

ATTORNEY-GENERAL PICKLE for State.

WILKES, J.   Defendant is convicted of violating the provisions of the Act of 1899, Chapter 205, commonly known as the "Uniform Text-book Act," and sentenced to pay a fine of $10 and costs, and has appealed.  The indictment in the case is in the following words:

"STATE OF TENNESSEE, BLOUNT COUNTY.

"Circuit Court, October Term, 1899.

"The grand jurors for the State of Tennessee, upon their oaths, present that Edward Leeper heretofore, to wit, on the 5th day of October, 1899, in the State and county aforesaid, being then and there a public school teacher and teaching the public school known as School No. 5, Sixth District of Blount County, did unlawfully use and permit to be used in said public school, after the State Text-book Commission had adopted and prescribed for use in the public schools of the State Frye's Introductory Geography as a uniform text-book, another and different text-book on that branch than the one so adopted as aforesaid, to wit, Butler's Geography and the New Eclectic Elementary Geography, against the peace and dignity of the State.

"A. J. FLETCHER, *Attorney-general.*"

From the bill of exceptions it appears that the defendant is a teacher of the public school known as School No. 5, in the Sixth District of Blount County, and that he failed and refused to teach

the geography adopted by the State Text-book Commission—namely, Frye's Introductory Geography—and that instead he willfully and unlawfully taught Butler's and the New Eclectic Elementary Geography in said school. It is not insisted that there is any defect in or objection to the book prescribed by the State Text-book Commission to be used and which he refused to teach.

The caption to the Act under which the conviction is had thus expresses the object and subject-matter of the law, to wit:

"An Act to create a State Text-book Commission, and to procure for use in the public free schools in this State a uniform series of text-books; to define the duties and powers of said commission and other officers; to make an appropriation for the carrying into effect this Act, and to provide punishment and penalties for the violation of the same."

The substance of the Act, so far as now necessary to be set out, is as follows:

Section 1 creates a State Text-book Commission, and empowers and directs it to select and adopt a uniform system or series of text-books for use in the public schools of the State. The Commission is to consist of the Governor, State Superintendent of Public Instruction, and three members of the State Board of Education to be selected by the Governor. The text-books selected by the commission are to be used for five years in all

the public schools of the State, and it is made unlawful for any school officer, director, or teacher to use any other text-books on the same branches. The series of books to be selected cover all the branches of study usually taught in the public schools. The Commission is required to appoint a subcommission of five, to be selected from the teachers and city and county superintendents actually engaged in teaching in the State, to whom all books submitted to the Commission shall be referred for report.

Section 2 makes the Governor president of the Commission, requires the Commission to meet and organize immediately after the passage of the Act, and directs it, as soon as practicable, and not later than thirty days after organization, to advertise in such manner, and for such length of time, and at such places as may be deemed advisable, for sealed bids or proposals from publishers of school text-books, for furnishing books to the public schools in the State, through agencies established by said publishers at places designated by the Commission. Each bidder is required to deposit with the Treasurer of the State a sum of money, such as the Commission may require, not less than $500, nor more than $2,500, according to the number of books he may propose to supply. This deposit is to be forfeited if the bidder, in the event his bid is accepted, fails and refuses to make the contract and bond required by the

Act. Each bid is to be accompanied by one or more specimen copies of each book proposed to be furnished.

Section 3 requires all the specimen copies sent in with the bids to be referred to the subcommission for examination, with instructions to report back to the Commission the books they recommend for adoption. When this report is submitted; the Commission is to meet in executive session, open the bids, examine and consider the report of the subcommission, and determine the books to be selected for adoption. The successful bidder is then to be notified and the contract executed. Each contractor is to give a bond, in the penalty of not less than $30,000, for the faithful performance of the contract.

Section 4 provides that the contractors shall print plainly on the back of each book the contract price, as well as the exchange price at which it is to be furnished; and it then provides, among other things, as follows.: "And the said Text-book Commission shall not, in any case, contract with any person, publisher, or publishers, for the use of any book or books which are to be or shall be sold to patrons for use in any public school in this State, at a price above or in excess of the price at which such book or books are furnished by said person, publisher or publishers, under contract to any State, county or school district in the United States, under like conditions

prevailing in this State, and under this Act; and it shall be stipulated in each contract that the contractor has never furnished, and is not now furnishing under any contract, any State, county, or school district in the United States, where like conditions prevail as are prevailing in this State, and under this Act, the same book or books as are embraced in said contract, at a price below or less than the price stipulated in said contract."

Section 5 provides that the State shall not be liable to any contractor in any manner for any sum whatever, but all such contractors shall receive their pay or consideration in compensation solely and exclusively derived from the proceeds of the sale of the books. It also provides that in furnishing the new books the contractor shall take up the old schoolbooks now in use, in exchange, at a price not less than 50 per cent. of the contract price.

Section 6 provides for readvertising for other bids and proposals if the first are not satisfactory, and also for receiving proposals from authors who have manuscripts of books not yet published.

Section 7 requires the Governor, as soon as the contracts have been entered into, to issue his proclamation announcing such fact to the people of the State.

Section 8 requires the contractors, first, to establish and maintain in some one city in each grand division of the State a depository, to be

designated by the Commission, where a supply of
the books, sufficient to meet the immediate demand,
shall be kept; second, to maintain in each county
of the State, if the Commission so demands, not
less than one, nor more than four, agencies for
the distribution of the books; and, third, to de-
liver to the person ordering, all books ordered,
provided the price is paid in advance, free of
exchange or postage, if out of the county. It
also provides that in each book sold there shall
be printed the following: "The price fixed herein
is fixed by State contract, and any deviation
therefrom shall be reported to your county Super-
intendent of Public Instruction, or the State Super-
intendent at Nashville."

Section 9 allows the Commission to renew the
contracts, or, in its discretion, to readvertise and
make new contracts for an additional five years.

Section 10 requires the State Superintendent to
issue a circular letter to each city and county
superintendent, and to such others as he may de-
sire, giving the list of books adopted, prices, loca-
tion of agencies, etc.

Section 11 provides that the books adopted shall
be introduced as text-books, and be used as such
to the exclusion of all others in all the public
free schools in the State.

Section 12 reserves to the citizens the right to
buy books in the usual way, in the event that no
contract is made, or if the contractor fails or re-
fuses to furnish the books.

Sections 13 and 14 make it a misdemeanor for any person or teacher to violate the Act, and for any teacher to use, or permit to be used, in his or her school any text-book other than those adopted by the Commission, and fix as the punishment for same a fine of not less than $10, nor more than $50.

Section 15 makes it a misdemeanor for any dealer, clerk, or agent to sell the book for more than the contract price.

Section 16 appropriates $1,000 for the purpose of carrying out the provisions of the Act.

Section 17 deals with the question of compensation for the Commission and subcommission.

And Section 18 provides that the Act shall take effect from its passage.

It is insisted that the Act is unconstitutional, because (1) it allows a monopoly, (2) it delegates legislative power, (3) it denies local self-government.

These are quite general terms, and if they stood alone would be insufficient to challenge the validity and constitutionality of the Act, for it is well settled that he who insists upon the unconstitutionality of an Act of the General Assembly must point out the specific provision of the Constitution which either expressly or by necessary implication it violates. It has been said: "It cannot be invalidated upon some supposed or assumed natural right or equity, upon the general statement that it is

opposed to the inherent rights of freemen, nor upon any spirit supposed to pervade the Constitution, not expressed in words, nor because it is opposed to the genius of a free people, nor upon any general or vague interpretation of a provision beyond its plain and obvious import." *Bell* v. *The Bank,* Peck, 269; *Hope* v. *Deaderick,* 8 Hum., 8; *Demoville* v. *Davidson Co.,* 3 Pickle, 220; *Davis* v. *The State,* 3 Lea, 277; *Stratton* v. *Morris,* 5 Pickle, 497; *Luehrman* v. *Taxing District,* 2 Lea, 438; *Reelfoot Lake* v. *Dawson,* 13 Pickle, 159; *Henley* v. *The State,* 14 Pickle, 683.

It is insisted that the following provisions of the Constitution are violated:

Art. I., Sec. 8, provides, among other things, that no man shall be disseized of his privileges but by the judgment of his peers or the law of the land.

Art. I., Sec. 22, provides that perpetuities and monopolies are contrary to the genius of a free State, and shall not be allowed.

Art. XI., Sec. 8, provides, among other things, that the Legislature shall not have power to pass any law granting any individuals rights, privileges, immunities, or exemptions, other than such as may be by the same law extended to any member of the community who may be able to bring himself within the provisions of this law.

These may be considered together as presenting the general question that the effect and operation

of the Act is to grant to the publisher who has been successful in obtaining the privilege of furnishing the books, a monopoly, and has conferred on him special rights, privileges, immunities, and exemptions, and thus a monopoly is allowed, and that the people generally of the State are deprived of the right and privilege of, first, selecting their own school books; second, of buying them in the open market; and, third, other publishers are excluded from selling in competition with the successful party.

The interpretation given to this Act by the State school authorities is clearly set out in an official letter from the State Superintendent of Public Instruction, as follows:

"STATE OF TENNESSEE, DEPARTMENT OF PUBLIC INSTRUCTION.

"Morgan C. Fitzpatrick, Superintendent.
"David L. Spence, Clerk.
"NASHVILLE, TENN., September 23, 1899.
"*Mr. Wilford Caulkins, Chattanooga, Tenn.*:

"DEAR SIR—The text-book law passed by the last Legislature provides that the contract and exchange prices of all books shall be printed upon them, and the law provides further: 'All books shall be sold to the consumer at the retail contract price, and in each book shall be printed the following: "The price fixed hereon is fixed by State contract, and any deviation therefrom shall be re-

ported to your county superintendent, or the State Superintendent at Nashville.'"

"From this it will be clearly seen that it was the intention of the Legislature to adopt for use in the schools of this State a certain series of books, and that every book so adopted should have printed upon it the contract and exchange prices, and that no books should be used except those so marked. It was the intention of the Commission, acting under the law, to provide an excellent series of books, and to protect the people against the importation and sale of second-hand books. The safe, correct, and legal rule to follow is: Purchase and use no books unless they have the contract and exchange prices printed upon them. Superintendents and teachers should accept and use those books adopted by the Commission, with prices, according to law. Yours very truly,

"MORGAN C. FITZPATRICK."

Treating this, as well as the Act, as an inhibition against the use of any books unless they have printed upon them the words specified in the eighth section, even though other books similarly bound, containing the same matter and by the same author, can be bought at less price in the open market, the question recurs: Is such legislation valid, or does it allow a monopoly and confer special rights and privileges, or restrict the right to sell and buy which previously existed?

It must be noted that the Act only applies

and the inhibition only extends to persons interested in public schools as officers, teachers, patrons, and pupils, and only to books that are used and to be used in the public schools. For any other purpose than use in the public schools, any book may be bought, and from any person and by any person, and put to any use.

This is the common right to buy and sell which existed before the Act was passed and which still continues unaffected. The books may now be bought as freely as before the Act. It is the use in the public schools which the Act regulates and is intended to regulate; so that, as to the buyer, no common right is taken away. As to the seller, he may also sell as before the Act, and not only so, but under the provisions of the Act the exclusive right to publish and sell for schools was left open to his competition in the first instance—that is, all publishers were invited to freely compete for the contract or privilege of furnishing all the books, or any series of them, to be used in the schools.

A monopoly has been defined to be an exclusive right granted to a few of something which was before a common right. *Memphis* v. *Memphis Water Co.,* 5 Heis., 529; *Charles River Bridge* v. *Warren River Bridge,* 11 Peters, 707.

It is insisted that the right to sell and the right to buy in the open market are common rights, open to all, and without restriction upon

any. But the right to sell and buy in the open market and the right to contract is not an unlimited one. The Legislature has in a number of instances restricted such rights, and the limitations have been upheld by the Courts. Thus it is provided by statute that a person may not sell unwholesome fish or flesh, or bread, or adulterated liquors, or poisonous drugs, without a label (Shannon's Code, Sec. 6743, and subsections); and it is held that transportation companies and telegraph companies cannot contract for exemption from liability for their own negligence. *Transportation Co. v. Bloch,* 86 Tenn., 392; *Marr v. Western Union Telegraph Co.,* 85 Tenn., 529. It is true the first class of cases rests upon the exercise of the police power of the State, and the latter upon the public character of the railroad and telegraph company, upon which a use is imposed which sanctions legislative interference. But it is not difficult to place the present legislation under either of these heads, since the kind and quality of instruction given the young is as important as the food furnished the people, and the public school is in the highest sense a public institution, whose operation involves a public use.

But legislation has not been confined to such cases in limiting the right to contract. It is provided by statute that a husband may not sell his wife's real estate during her life without her consent, and that he may not contract away the

rents and profits without such consent. Shannon, 4234-4239. The constitutionality of such acts has been declared, though they abridge the right which the husband had at common law to contract. *Coleman* v. *Satterfield,* 2 Head, 264; *Taylor* v. *Taylor,* 12 Lea, 490. So it has been held that the Legislature might prohibit the sale of loose cotton between sundown and sunrise. *Truss* v. *The State,* 13 Lea, 311. Statutes of fraud, statutes against usury, statutes making contracts of married women unenforceable, and many others, are limitations upon the power of the citizen to contract. So with the statute making void stipulations in insurance policies which limit liability to less than full amount of the loss. This has been held valid. *Dugger* v. *Insurance Co.,* 11 Pickle, 245, and cases there cited.

It is immaterial whether we consider this Act as deriving validity from the police power of the State or the public character of the schools. It is evident that the basic principle of it is the power of the Legislature to subserve the general welfare by prohibiting certain contracts and throwing around others restrictions tending to promote the general welfare and protect the citizen from oppression, fraud, and wrong.

That the State may establish a uniform series of books to be taught in the schools which it provides and controls, seems to be a proposition as evident as that it may provide a uniform sys-

tem of schools, which, we take it, is not now an open question; and while the selection of textbooks may in the earlier and cruder stages of the law have been left to and exercised by local superintendents, directors, and teachers, it was not for want of authority in the State to prescribe a uniform system, but rather because the system had not reached that stage of development and progress that made it advisable, in the opinion of the Legislature, to so provide. If we were allowed to look to the wisdom of such a provision, it would seem that a uniform series of schoolbooks, selected by men of large experience and extensive information, would be preferable to leaving such selection to superintendents, directors, and teachers—many without experience, some with limited education, and with limited opportunity of examining and comparing the different books.

But it is said that, if it be granted that a uniform series may be selected, still it is beyond the power of the Legislature to confer upon one individual the right to publish and sell to the public schools any particular book or books, and to prohibit teachers and patrons from using any other, thus forcing them to buy the books thus furnished or refusing them the benefits of the public school.

We think it clear that the State itself might, if it saw proper, publish the books to be used in its public schools, and might sell them to the

children of the State or patrons of the schools;
and if it can do this, why may it not authorize
another to do so and prescribe the terms upon
which it shall be done in the interest of its
citizens? *City of Memphis* v. *Water Co.,* 5 Heis.,
530.

The authority of the State over schools is a
legislative one, and it is difficult to see how a
uniform system can be maintained which will con-
fer equal benefits upon all sections of the State,
unless it is done by legislative action. If the au-
thority to regulate and control schools is legis-
lative, then it is must have an unrestricted right
to prescribe methods, and the Courts cannot inter·
fere with it unless some scheme is devised which
is contrary to other provisions of the Constitu-
tion, so that the question recurs: Does the Act
create such a monopoly as the Constitution in-
hibits?

It is not insisted that the intention or operation
of this Act is to confer a pecuniary benefit on
the State or school officials or publishers. On the
contrary, its evident purpose is to confer a benefit
upon the public by providing ways and means by
which books may not only be made uniform
throughout the State, but also furnished to the
public at as small cost as possible. If a privilege
thus conferred upon an individual, the object of
which is to benefit the State and its citizens, can
be termed a monopoly, it is certainly not of that

class prohibited by the Constitution, which refers to privileges granted for a money consideration, or which are bestowed upon an individual for his benefit. The monopoly prohibited by the Constitution is a privilege farmed out to the highest bidder, or conferred because of favoritism to the donee, and not one awarded to the lowest bidder and for the convenience and benefit of the public.

If this doctrine be not correct, then the State can make no contract for supplies for its penitentiary, for its charitable institutions, for its public printing, for building its statehouses, or any other work of public utility or necessity; for when it has, perchance after the sharpest competition, awarded a contract or privilege for any particular enterprise, such contract becomes at once a monopoly, because every other citizen of the State may not also do the work or furnish the material. In other words, to let any public work to the lowest bidder creates at once a monopoly contrary to the Constitution. Under this reasoning the successful bidder becomes *ipso facto* a monopolist, because, by virtue of his bid (the lowest made), he becomes entitled or onerated to supply the article or do the work. If this grant to a publisher to furnish all the books needed in the schools was not coupled with a restriction upon price and other benefits to the citizen, then it might be denominated a monopoly.

It is said that the arrangement made with the

publisher is not a contract with the State, and the argument appears to be that the State has not bound herself in any way to the publisher, that it does not receive or pay for the books, and there is no contract between the publisher and the school boards, nor with the patrons of the schools, and for this reason the privilege is invalid. Even if it be not a contract in the sense that the State cannot be forced to comply with it, this would not invalidate the law. *Bancroft* v. *Mayer,* 5 Sawyer, 502.

We think this contention, however, is not well made. The State frequently grants to railroads and other agencies privileges and concessions coupled with conditions in favor of the public and so with municipalities in granting water rights, and lighting rights, and rights to street car companies. It is said there are no safeguards against extortion · and oppression, but we have, in the first place, a letting at the lowest rates in free competition, after public advertisement, and a further. provision that the price shall always be as low as the books have ever been, or are now being published under contract in any State, county, or district of the United States where like conditions prevail. It is said that this term, "like conditions," is indefinite and that it is not specified who is to be the judge as to whether the conditions are alike or not. But this, as well as the enforcement of the undertaking, is

provided for in the 4th and 8th Sections of the
Act, which empower the Commission created by
the Act to sue for a breach of the contract at
any time, and this commission is the judge of
the conditions as well as all breaches of the con-
tract by the terms of the Act itself, subject in
all proper matters to revision by the Courts. It
is said that to allow the State to prescribe the
books, fix their prices, and let out the privilege
of supplying them, would establish a precedent
that would lead to extreme results. That if the
State may thus control the books, it may in like
manner provide the houses and desks and a uni-
form for the students, and let out the privilege
for furnishing them to some one individual. Grant
this may be so. It is evident that some one
must decide upon these matters and provide the
articles deemed necessary, and it simply resolves
itself into the query whether the State, which pro-
vides and maintains the system shall control and
regulate it, or leave that duty to others, who, at
last, are but its agents and representatives. Of
course, we cannot presume, nor can any argument
be based upon the assumption that the State will
go to absurd lengths, but the presumption is that
the Legislature, which more immediately represents
the people, will do what it deems best for the
people.

It is said the schools do not belong to the
State, but to the people, and while in a certain

sense this is true, it is at last but a play upon words. The system is inaugurated, operated, shaped, supported, and controlled by the State through its Legislature, but for the benefit of the people, and as in all other matters of public concern, the people act through their immediate representatives, the Legislature. It is said the fixing of the price is not at all necessary to the maintenance of the uniform series; that if the books are selected and then the patrons are left free to buy them in the open market, the best interest of the citizen will be conserved. But it is evident that such would not be the result in case of a copyright book, since they could only be obtained of the party having the right, and many of the best books are copyrighted; nor is it reasonable to suppose that individual buyers in open market could secure rates as low for a single book or a lot of books as can be obtained when the contract is for the entire publication, and all the books used, or any particular series. But this, after all, is a matter which addresses itself to the sound judgment of the Legislature.

It is said the State has no right to prescribe that the citizen or consumer must pay cash in advance for an article he buys, and that credit is a matter of public right. It is evident that the requirement for a cash payment must be considered along with all the other features of the legislation, and that if the payment of cash may

seem arbitrary it is not so, but enables the con-
tractor to reduce his price, as he feels sure of
his money and that it will not be either delayed
or rendered uncertain. Besides, the provision re-
quiring cash payment only applies when books are
ordered to be sent out of the county, when a
depository is not located in it, in which case the
book must be delivered free of expense of car-
riage.

It is said that it is not a function of gov-
ernment to pass statutes to secure cheap prices
to the consumer, and this should be left to the
laws of competition, of supply and demand. This
is but a statement of the main question in a
different shape. We may grant that the State
may not regulate prices of commodities generally;
and may not legislate so as to secure cheap rates
for the same. but this does not prevent the State
from securing for the children of the State who
desire to enter the schools which it has provided
for their benefit, favorable terms upon which they
may enter and enjoy their benefits.

The next objection urged is that the Act dele-
gates legislative power to a Commission and to
the Executive of the State.

The main provisions of the Act which bear
upon this question are those which provide that
a Commission may select the books, make con-
tracts for obtaining them, and perfect the details
of the general plan of providing all schools with

the books chosen, and obtain for pupils and patrons the lowest prices possible. As an incident to this, the Commission and Governor are to announce when the details have been arranged, so that the law may be put into operation. If we grant that the Legislature has the power to prescribe and enforce the system, since it is one that requires the adjustment of many details, it is evident that such details can only be carried out by a commission. In such cases the Legislature can only act through boards and commissions, or other agencies, and there can be no valid objection unless legislative power is conferred upon the board. It is said the Act leaves it to the Commission to say when it shall take effect. This, we think, is not a proper construction of it. The Act takes effect from and after its passage, as do other Acts.

The Commission has no power to delay its force as a law. It simply is authorized to report when it has consummated the preliminary work devolving upon it of selecting the course, making contracts for the books, fixing their price, designating the depositories, and otherwise prescribing the time and manner in which the patrons and children may begin to receive its advantages.

This Commission is given no power to delay the enforcement of the law beyond this limit. It is true it may do so, but this would be not in obedience to the law, but in violation of it. Sup-

pose that the State should determine to erect a penitentiary, or an asylum for the blind or deaf or insane, and should appoint a Commission to select a site, to prepare plans, to employ an architect, to contract for buildings and erect them, to frame rules and regulations for their govern- ment of the inmates, and should direct that when ready for occupation the Commission should, by public advertisement, announce the fact, so that the buildings could be put to the intended use, and that persons could be received therein, could this be called a delegation of legislative author- ity? We think not, and we fail to see any dif- ference between the provisions of such an Act and the present one. It does not delegate legis- lative power—that is, any power to pass or annul a law.

There is a difference between a delegation of power to make laws, involving necessarily a dis- cretion as to what they shall be, and a grant of authority relating to their execution, though the latter may involve the exercise of discretion under and in pursuance of the law. 6 Am. & Eng. Enc., 2d Ed., 1029.

Mere administrative or executive functions may be delegated. *Cin: R. R. Co.* v. *Clinton Co.*, 1 Ohio State, 88.

The difference between the power to pass a law and the power to adopt rules and regulations to

carry into effect a law already passed is obvious. *Ga. R. R. Co.* v. *Smith,* 70 Ga., 694.

The Legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. *Locke's Appeal,* 72 Pa. State., 498; same case, 13 Am. Rep., 716.

In *Moers* v. *Reading,* 21 Pa.. State, 202, it was said: "Half the statutes on our books are either alternative, depending on the discretion of some person or persons to whom is confided the duty of determining whether the proper occasion exists for executing them, and it cannot. be said that the exercise of such a discretion is the making of the law."

A notable instance of the delegation of such discretion and power to the Executive is found in the case of *Field* v. *Clark,* 143 U. S., 649, wherein the President was authorized to reduce the revenue and equalize duties on imports and for other purposes, to suspend by proclamation the free introduction of sugar, molasses, coffee, tea, and hides, when he should be satisfied that any country producing such articles imposed duties or exactions upon the agricultural or other products of the United States, which he deemed to be reciprocally unequal or unreasonable. See the doctrine fully illustrated in 6 Am. & Eng. Enc. L., 2d Ed., 1029 to 1031, and cases there cited.

It is said the Act denies local self-government. This, of course, is a general term, and no specific provision of the Constitution is referred to, upon this feature of the case, as being violated. It is said in broad terms that the people have an inherent fundamental and vested right to administer their own local affairs as the people of each county and district shall deem right and proper. We cannot enter into a consideration of such general doctrine, but will attempt to discuss it so far as it touches upon the common school system and the manner of its execution. This system is supported in part by State funds and in part by county taxes. But the latter at last are but State funds, provided by the State through the power delegated to the counties.

It is insisted that heretofore there has been more or less of local control and government of the public schools, but this local government was authorized by and was the creature of the statute, and the Legislature is not precluded from framing other statutes if it deem it wise to do so, modifying former plans. By the Act of 1873, under which the present system was inaugurated, it was provided that there should be established and maintained in this State a uniform system of public schools, and that it should be administered by a State Superintendent, County Superintendent, and District Directors. Shannon, Secs. 1401, 1402. The fund for school purposes was provided by the same

Act, and consists of the interest on the permanent
school fund and all other moneys that may come
into the State treasury for that purpose from
any source whatever, treating the permanent school
fund and the educational fund as one for all pur-
poses of distribution. Act of 1873, Ch. 25, Sec.
35; Shannon, Sec. 1391.

The interest on the permanent school fund
and school tax was augmented by a poll tax,
and by fines and penalties in certain . cases, and
also by a tax by each county when other taxes
were not sufficient to sustain the schools for five
months in the year.

By the Act of 1844 all school · funds then ex-
isting, no matter from what source derived, were
ordered to be deposited in the Bank of Tennes-
see for investment ·in State bonds.

The proceeds of lands which had been sold
under the Acts of Congress became thenceforth a
part of the capital of the bank. They became
assets of the bank, and the counties which had
· deposited ' school land funds became simple cred-
itors of the bank, except so far as they might
be enabled to identify bonds bought for them,
and this they could never do. So that coun-
ties entitled to such special funds thereafter had
no priority over other depositors of the bank or
its general creditors. *State* v. *Bank of Tenn.,* 5
Baxter, 7, 31, 32. However this may be, · the
Constitution of 1870, and the Act of 1873, recog-

nizing the fact that the entire actual school fund originally existing had been lost. by the fortunes of war and subsequent events, spoke into existence by constitutional and legislative fiat a school fund of $2,512,500, which was made a permanent fund, and the faith of the State was pledged to the payment of interest upon that fund for the equal benefit of all the people of the State. This fund thus spoken into existence was for the benefit of every county and all the people equally.

The constitutional provision of 1870 relating to it is as follows:

"Knowledge, learning and virtue, being essential to the preservation of republican, institutions and the diffusion of the opportunities and advantages of education throughout the different portions of the State being highly conducive to the promotion of this end, it shall be the duty of the General Assembly. in all future periods of this government, to cherish literature and science. And the fund called the Common School Fund, and all the lands and proceeds thereof, dividends, stock, and other property of every description whatever, heretofore by law appropriated by the General Assembly of this State for the use of common schools, and all such as shall hereafter be appropriated. shall remain a perpetual fund, the principal of which shall never be diminished by legislative appropriation; and the interest thereof shall be inviolably appropriated to the support and en-

19 P—34

couragement of common schools throughout the
State, and for the equal benefit of all the people
thereof; and no law shall be made authorizing
said fund or any part thereof to be diverted to
any other use than the support and encourage·
ment of common schools." Const., Art. XI., Sec. 12.

Since the inauguration of the present system of
public schools in 1873 it has never been even
suggested that the State and counties may have
different systems and schools, the State operating
a State school and the county a county school,
but the basic idea is that the county may sup-
plement the State funds so as to enlarge and im·
prove the State schools. Carried to its logical re-
sult, the contention of counsel is that each county
may have its own system, make its own rules,
prescribe its own course of study, and, proceeding
further, each school district may do the same, so
that we may have as many systems in the State
as there are school districts. This is carrying the
doctrine of local government too far. By the same
parity of reasoning it might be said that each
county may establish its own criminal laws, pro-
vide its own courts to execute the laws, and to
deny them such rights would be to deny the
right of local self-government.

We are of opinion that the Legislature, under
the constitutional provision, may as well establish
a uniform system of schools and a uniform ad··
ministration of them as it may establish a uni-

form system of criminal laws and of courts to execute them.

The object of the criminal laws is by punishment to deter others from the commission of crime, and thus preserve the peace, morals, good order, and well-being of society, and the object of the public school system is to prevent crime by educating the people, and thus, by providing and securing a higher state of intelligence and morals, conserve the peace, good order and well-being of society.

The prevention of crime and preservation of good order and peace is the highest exercise of the police power of the State, whether done by punishing offenders or educating the children. What is the scope and meaning of the term "police power" has never been defined. The Supreme Court of the United States has expressly declined to define its limits. *Stone* v. *Mississippi,* 101 U. S., 814.

In *Mayor of New York* v. *Miln,* 11 Pet. (U. S.), 139, it is said: "It embraces every law which concerns the welfare of the whole people of the State or any individual within it, whether it relates to their rights or duties, whether it respects them as men or citizens of the State, whether in their public or private relations, whether it relates to the rights of persons or property of the whole people of the State, or of any individual

within it and upon the persons and things within it."

In *Hannibal R. R. Co.* v. *Husen,* 95 U. S., 465, it is said: "The police power of a State extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and to the protection of all property within the State, and hence to the making of all regulations promotive of domestic order, morals, health, and safety."

In *Smith* v. *The State,* 16 Pickle, 505, it is said, in substance, that it extends to all questions of health, morals, safety, order, comfort, and well-being of the public, and that this enumeration does not make the list complete.

Similar language has but recently been used in the case of *Harbison* v. *The Knoxville Iron Co.,* and this is no new doctrine, either in this State or in the United States.

In *Bancroft* v. *Mayer,* 5 Sawyer (U. S.), 502, it has been held that a State may provide by legislation that a designated person shall have the exclusive privilege of furnishing all the text-books needed for use of the public schools, and the Court said: "To authorize and provide that, by means of contract or legislative grant, a particular person shall have the exclusive right to do or furnish a particular thing upon certain conditions for the use and convenience of the public, has

always been a common mode of exercising the police powers of the State."

This question of providing a uniform series of text-books and prescribing the manner in which it may · be done, and the procuring. of such books and their distribution, as here done, is not a new one in the United States. It appears that more than twenty States have preceded Tennessee in passing uniform text-book laws. It is said that in some of them it has not resulted favorably, and the system has met with disfavor. How this is, is a matter which addresses itself to the Legislature and not to the Court. With the wisdom and policy of the law we have nothing to do.

In some of the States the validity and Constitutionality · of the Acts have been called in question, and the material provisions of the law have been sustained.

The subject is elaborately considered in the case of *State* v. *Haworth,* 122 Ind., 462 (S. C., 7 L. R. A., 240), where the constitutionality of an Act very similar to the one now under consideration was involved, and · the arguments against it were much the same as are now made. The Court very elaborately considered the provisions of the Act and the objections raised, and sustained the Act, citing many authorities in accord, and among them: Cooley's Constitutional Limitations, 5th Edition, 225, note 1; *Curryer* v. *Merrill,* 25 Minn., 1 (S. C., 33 Am. Rep., 450); *State* v.

Leeper v. State.

*Board of Education*, 18 Nevada, 1173; *People v. Board of Education*, 55 Cal., 331; *People v. Board of Education*, 49 Cal., 684. See also *Baltimore School Coms. v. State Board*, 26 Md., 505; *State v. Blue*, 122 Ind., 600; *State v. Springfield Directors*, 74 Mo., 21; *State v. Webber*, 108 Ind., 31; 58 Am. Rep., 30; *Lake View School Trustees v. People*, 87 Ill., 303; *Jones v. Board of Education*. 88 Mich., 371; *Effingham v. Hamilton*, 68 Miss., 523.

The reasoning of the Court in the principal case of *State v. Haworth* is so satisfactory and conclusive that we cannot, perhaps, do better than give a synopsis of it. It was held that such an Act does not infringe in the slightest degree upon the right of local self-government; that essentially and intrinsically the schools in which are educated and trained children who are to become rulers of the Commonwealth are matters of State, and not local, jurisdiction; that in such matters the State is a unit, and the Legislature the source of power; that the establishment and control of public schools is a function of the General Assembly, both under the Constitution and because it is a matter of State concern. Being a matter of legislative control, the Legislature may abandon one plan and try another if it see proper, and the Court cannot interfere. It is further pertinently said that it is impossible to conceive of the existence of a uniform system of public schools

without power lodged somewhere to make it uniform, and, in the absence of express constitutional provisions, that power must necessarily reside in the Legislature, and hence it has the power to prescribe the course of study as well as the books to be used, and how they shall be obtained and distributed, and its discretion as to methods cannot be controlled by the Courts; that such an Act does not provide a benefit for book dealers, but its purpose is to secure such benefits for the public, and such benefits as may arise to any individual are merely incidental; that such statute is not within the constitutional provisions directed against monopolies, but that the purpose of the Act is to secure books for the public schools by means of open competition after full notice; no special privilege is granted, none denied; all are invited to enter the field.

The Court says: "We can find neither reason nor authority that suggests a doubt as to the power of the Legislature to require a designated series of books to be used in the schools, and to require that the books selected shall be obtained from the person to whom the contract for supplying them may be awarded. It is to be remembered that the statute does not command that every person shall buy the books; it confines the requirement to those who receive the benefit of the public schools. These schools are owned and maintained by the State, and the State may pre-

scribe the terms and conditions upon which pupils may enter them, except that it cannot disregard the constitutional injunction, 'tuition shall be without charge and equally open to all.' It may, as we have seen, prescribe the course of study that shall be pursued, and the system of instruction that shall be adopted, and to perfect and complete its control it must have the power to prescribe the books that shall be used and the mode in which the books shall be obtained; the Legislature simply commands that those who enjoy the benefits of the schools which it maintains shall secure such books as it deems best and in the mode it regards as expedient. Power thus asserted is exercised in a matter which is not of common right, but which concerns institutions founded and fostered by the State. The regulation, in its entire scope, relates exclusively to the enjoyment of the privilege afforded by a system of education created and maintained by the State for the general good, and it must follow that the State does have power to make the regulations effective by prescribing the method which shall be pursued by those who seek to enjoy the privilege it has created. Certainly no one will deny the existence of such a right, and if it does exist it must reside in the lawmaking power of the State.

"The regulation of the mode of receiving books by the pupils of the common schools is not analogous to a regulation of general property rights,

Leeper *v.* State.

for books are peculiar to schools, and schools are the property of the State. It is no answer to this argument to affirm that the State may not give one person the exclusive privilege of selling fuel, clothing, or the like to a community, for schoolbooks are unlike such property in their chief characteristics, and the Legislature does not assume to declare that any person may not sell books to a community; it simply assumes the power of declaring that the person whom the State Board of Education decides is the lowest bidder shall have the exclusive privilege of supplying its schools with books. In doing this it does no more respecting schools than a private citizen does who contracts with another to furnish him goods for a designated period, nor does it do more regarding schools than it does with respect to all public institutions whose officers are authorized to give the exclusive privilege of furnishing groceries, medicines, or other articles to the person to whom a contract covering a designated period is awarded, for the State owns and maintains its schools just as much as it does its public institutions of every kind.

For the reasons stated we are of opinion the Act is valid and constitutional, and there is no error in the judgment of the Court below, and it is affirmed, with costs.