D. G. STEELE, ADMR., *v.* LOUISVILLE & NASHVILLE R. R. Co.*

(*Jackson.* April Term, 1926.)

Opinion filed July 13, 1926.

1. **RAILROADS. Signs at public road crossings.**

Without the erection of crossing signs, required by Code 1858, sec. 1166, subsec. 1, Shannon's Code, sec. 1574, subsec. 1, engineers, prior to Act 1921, chapter 41, owed no duty even under common law to sound bell or whistle as warning. (Post, p. 211.).

Citing: Acts 1921, ch. 41; Acts 1919, ch. 149; Acts 1855-6, ch. 94; Acts 1857-8, ch. 44.

Citing: Graves v. Railroad, 126 Tenn., 153; Hurt v. Railroad, 140 Tenn., 636; Southern R. R. Co. v. Elder, 81 F., 791.

Citing and distinguishing: L. & N. Turnpike Co. v. State, 50 Tenn., 130.

Code cited and construed: Sec. 1537, subsecs. 1, 2; Secs. 1575, 1576; 1720a 75, (S); Sec. 1574, subsecs. 1, 2; Secs. 1166, 1198, 1223, (Code 1858.)

2. **SAME. Same.**

Provisions of Code 1858, sec. 1166, Shannon's Code, sec. 1574, and subsequent sections, relative to signs at public road crossing over railroads, are mandatory. (Post, p. 214.)

Acts cited and construed: Private Acts 1913, ch. 32, sec. 8; Acts 1921, ch. 21.

Citing and distinguishing: Hurt v. Railroad, 140 Tenn., 636.

3. **CONSTITUTIONAL LAW. Railroad signs at public crossings.**

Acts 1921, ch. 44, is not invalid, as delegating legislative power, because of authorizing Railroad commission to designate form of crossing signs authorized by Act. (Post, pp. 215-218.)

4. **RAILROAD. Signs at public road crossings.**

The erection of uniform railroad crossings signs under Acts 1921, chap. 41, will not be construed as amendatory of section 1166 of

Code, 1858, for constitutional reasons; but the exercise of the state's police power to establish a standard crossing sign, and to prevent the erection, near it, of confusing ones. (Post, p. 219.)

Citing: Constitution, art. 2, sec. 17; Code 1858, sec. 1166, subsec. 2; Shannon's Code, sec. 1574, subsec. 1, 2.

Cases cited: Cannon v. Matthews, 55 Tenn., 518; State v. Hayes, 116 Tenn., 42; Powers v. McKenzie, 90 Tenn., 178; Garvin v. State, 81 Tenn., 194.

**5. SAME. Same. Common law.**

The Act of 1921, ch. 41, creating uniform railroad crossing signs, repealed by implication, Code 1858, sec. 1166, subsecs. 2, 3; Shannon's Code, sec. 1574, subsecs. 1, 2, and restored the common law, as relates to the rights and duties of the public and railroad employees at such places. (Post, p. 220.)

**6. SAME. Delegation of power.**

The Legislature may delegate its power not legislative in character. (Post, p. 218.)

**7. STATUTES. Construction to save.**

The courts must give an Act interpretation, that will save it, if it can consistently be done. (Post, p. 220.)

Citing: Cole Manufacturing Co. v. Falls, 90 Tenn., 469; Hurt v. Railroad, 140 Tenn., 623.

---

FROM HENRY.

---

Appeal in error from the Circuit Court of Henry County.—HON. THOMAS E. HARWOOD, Judge.

DUDLEY PORTER, for appellant.

LEWIS & RHODES, for appellee.

MR. JUSTICE COOK delivered the opinion of the Court.

154 Tenn.—14.

R. R. Chandler was struck and killed by defendant's train on Currier crossing, two miles east of Paris. His administrator sued in statutory and common-law counts. The first count is based upon subsections 1 and 2 of section 1574, and sections 1575, 1576, of Shannon's Code. The second count attributes the death of deceased to the common-law negligence of the defendant.

At the conclusion of plaintiff's proof, the trial judge directed a verdict for the defendant, and plaintiff appealed. His assignments of error present two questions:

(1) Whether chapter 41, Acts of 1921, amended or supplemented subsections 1 and 2 of section 1574, of Shannon's Code, so as to make it obligatory upon the railroad to observe the statutory precautions imposed by the act of 1855-56, carried into the above Code sections.

(2) Whether the undisputed facts show that the contributory negligence of deceased caused his death.

It is urged by plaintiff that defendant is liable for failure to observe subsection 2, of section 1574, Shannon's Code, on approaching the crossing which was marked with a sign adopted under the provisions of chapter 41, Acts of 1921.

When chapter 41, Acts of 1921, was passed, the uniform road system that prevailed throughout the State when the Code of 1858 was promulgated no longer existed. Under modifying statutes we had:

First. County roads under control of the county courts, who appointed district commissioners, who in turn appointed overseers for particular roads. This class of roads existed only in counties of less than seventy thousand population, and not in all of these. After the passage of chapter 1, Acts of 1891, a number of con-

flicting statutes were passed, regulating the control and maintenance of public roads.

Second.  Under these subsequent statutes there were county roads under joint control of the county court and a county highway commission appointed by the court, or under the control of county commissioners elected by the people.  Under many of these private acts no provision was made for the office of road overseer.  The numerous private acts applicable to particular counties are indicated by note 3, under section 1720a75 of Shannon's Code.

Third.  Another class of roads existed under subsequent statutes, namely, State highways, built and maintained by the State highway department under chapter 149, Acts of 1919.

Except in those counties falling within the first class referred to, the office of road overseer within the meaning of subsection 1 of section 1574 of Shannon's Code did not exist.  In many counties of the State there was no overseer to erect the crossing signs required by statute, in the absence of which no locomotive engineer owed any duty, not even under the common law, to sound the whistle or bell to warn those near road crossing of the approaching train.  *Graves* v. *Railroad,* 126 Tenn., 153, 158, 159, 148 S. W., 239; *Hurt* v. *Railroad,* 140 Tenn., 636, 205 S. W., 437.

Section 1574 of Shannon's Code, taken from section 1166, Code of 1858, is as follows:

"In order to prevent accidents upon railroads, the following precautions shall be observed:

"(1)  The overseers of every public road crossed by a railroad shall place at each crossing a sign marked:

'Look out for the cars when you hear the whistle or bell;' and the county court shall appropriate money to defray the expenses of said signs; and no engine driver shall be compelled to blow the whistle or ring the bell at any crossing, unless it is so designated.

"(2) On approaching every crossing so distinguished, the whistle or bell of the locomotive shall be sounded at the distance of one-fourth of a mile from the crossing, and at short intervals till the train has passed the crossing."

Sections 1575 and 1576 provide as follows:

"Every railroad company that fails to observe these precautions, or cause them to be observed by its agents and servants, shall be responsible for all damages to persons or property occasioned by, or resulting from, any accident or collision that may occur.

"No railroad company that observes, or causes to be observed, these precautions shall be responsible for any damage done to person or property on its road. The proof that it has observed said precautions shall be upon the company."

In *Louisville & Nashville Turnpike Co.* v. *State,* 3 Heisk. (Tenn.), 130, the court said the statute evidently relates to overseers of common roads upon which overseers are annually appointed by the county courts under the Code 1858, section 1198, which reads:

"The county court shall annually appoint an overseer by an order which shall designate the bounds in which the persons subject to work on his road reside, and the class of the road which the overseer is required to keep in repair."

Section 1223, Code of 1858, provided:

"Every overseer of a public road shall put up, at every crossing of any railroad and such public road, a sign marked, 'Look out for the cars when you hear the whistle or bell;' and the county court shall appropriate money to defray the expenses of said sign."

By section 1223, supra, neglect of the duty to erect the signs at crossings rendered the overseer subject to indictment.

These provisions referred to and were intended to aid subsections 1 and 2, section 1574, Shannon's Code, taken from section 1166, Code of 1858, which was a reproduction of a similar provision in chapter 94, Acts of 1855-56.

In *Graves* v. *Railroad,* supra, referring to section 1574 et seq., Shannon's Code, the court; discussing the effect of subsections 1 and 2, said:

"It cannot be said, however, that all these sections of the Code which we have quoted, they being taken from chapter 94 of the Acts of 1855-56 and chapter 44 of the Acts of 1857-58, are declaratory of the common law. They are not, nor have ever been supposed to be by this court. . . .

"A statute cannot be declaratory of the common law in so far as it is repugnant to the common law. When there is a conflict between the common law and a statute, the provision of the statute must prevail. When a statute undertakes to regulate an entire subject, its provisions likewise must prevail. This statute is repugnant to the common law as respects the duties of railroad companies at public road crossings, and it undertakes to define and prescribe the entire duty of railroads at crossings as to giving warning of the approach of their trains.

"There is an absolute repeal of the common law on the subject, and there is no room for speculation about the matter.

"This view was taken by the United States circuit court of appeals, and stated thus:

" 'If the statute had been silent as to the duties of railroads where crossings were not so designated there would be room to infer that at undesignated crossings it would be the duty of such companies to exercise all the care and prudence required by the common-law. In the case supposed it could be well presumed that the common law was not repealed or altered, except in the case mentioned in the statute, and that at places so designated no signal or precaution other than those prescribed by the statute would absolve the railroad from responsibility. The peculiarity distinguishing this statute from all others to which attention has been called is that it expressly absolves railroads from blowing the whistle or ringing the bell unless the crossing be designated by the proper signboard.' *Southern Railroad Co.* v. *Elder,* 81 F., 791, 26 C. C. A., 615.' '

The effect, therefore, of sections 1166 and 1223, Code of 1858, requiring railroads to observe signs placed by overseers at public road crossings, was to relieve the railroad of the duty to warn persons of approaching trains by sounding a whistle or bell, unless such signs were erected.

The court has repeatedly held that the provisions of section 1166, Code 1858, section 1574, and subsequent sections of Shannon's Code, are mandatory and imperative, and that they should be literally construed and every provision given effect.

In *Hurt* v. *Railroad,* 140 Tenn., 636, 205 S. W., 437, the court discussed the effect of chapter 32, section 8, Private Acts of 1913, in its relation to section 1574 of Shannon's Code, and held that act so inconsistent with the provisions of the Code of 1858 as to repeal them by implication, concluding with the statement:

"The effect of the repeal of the sections of the Code is to restore the common-law liability of the defendant."

The act applicable to Shelby county authorized the board of county commissioners to regulate all highway crossings in Shelby county. The commissioners inspected all grade crossings and adopted a cross-arm sign maintained by the railroads, consisting of a post and cross-arms in the form of an "X" with the words "railroad crossing" printed on both sides.

The foregoing reference to our statutes and decisions indicates the state of the law when chapter 41, Acts of 1921, was passed. The act reads:

"An act to be entitled 'An act to prohibit the erection and maintenance of advertising signs resembling railroad crossing signs on the public highways and on private property within one-fourth of a mile of a public road; to provide for the determination of a standard railroad crossing sign; and to provide a penalty of the violation of the provisions of this act.'

"Section 1. Be it enacted by the General Assembly of the State of Tennessee, that it shall be unlawful for any person, firm, corporation, or association to erect or maintain on any public highway or street in the State of Tennessee, or on private property within one-quarter of a mile of any public road or street, any advertising sign similar to or resembling, or that can reasonably be

mistaken for the standard railroad crossing sign, or, for the owner or person in possession of such private property knowingly to permit the erection or maintenance of such sign on such private property. The erection of any such sign, designated by the Railroad Commission, shall be a compliance with provisions of existing statutes requiring the erection of signs at railroad crossings by the several counties.

"Sec. 2. Be it further enacted, that the railroad and Public Utilities Commission and the commissioners composing the department of highways of the State of Tennessee be, and they hereby are authorized, empowered and directed to meet within thirty days after the enactment of this act into law, and after such hearing as they may see fit to have, determine upon a form of railroad crossing sign, which shall be the standard for the State of Tennessee.

"Sec. 3. Be it further enacted, that any person or persons violating the provisions of section 1 of this act shall be guilty of a misdemeanor, and upon conviction thereof, shall be fined not less than $25 nor more than $100, or be confined in the county jail for a period of not less than thirty days, or by both such fine and imprisonment, at the direction of the court."

In obedience to the act, the Railroad Commission issued the following order:

"Pursuant to the provisions of chapter 41 of the Public Acts of the State of Tennessee 1921, the Railroad and Public Utilities Commission and the commissioners composing the department of highways of the State of Tennessee, have been considering the specifications for a 'standard railroad crossing sign,' for the State of Ten-

nessee, and have had the benefit of studies made by various railroads and the action on a similar matter by the Railroad Commission of the State of Georgia; it being desirable that the standard, when properly determined, shall apply alike to all States in this territory.

"It is therefore ordered by the Railroad and Public Utilities Commission of the State of Tennessee, that the 'standard railroad crossing sign' to be determined pursuant to the provisions of said act shall be what is commonly known as the X sign, same being a sign in the form of the letter 'X,' by boards crossed on an upright post. The boards forming the 'X' shall not be less than six (6) inches wide and four (4) feet in length, and shall be painted white, bearing on both sides in black painted letters not less than four and one-half (4½) inches high, the words 'Railroad Crossing.' The lowest point of the boards shall not be less than eight (8) feet above the surface of the ground. The sign shall be so placed as to best enable persons using public highways approaching the railroad from either direction to see the same.

"It is further ordered that the secretary of the commission shall send a copy of this order to each railroad operating in the State of Tennessee."

The last paragraph of section 1 of chapter 41, Acts of 1921, in an inartificial way expresses a purpose that the standard sign provided for in the act shall supplant signs authorized under pre-existing local and general statutes. The act is so conflicting with preceding legislation on the subject as to repeal it by implication and as to express a legislative purpose to eliminate signs provided under such legislation and substitute therefor the standard sign provided for in the act. This intent is

clearly inferable when we consider the act in the light of the old law, the confusion under it, and the purpose expressed in the latter act of remedying the evil by avoiding the confusion.

It is insisted by appellee that the act is void because it undertakes to delegate legislative power to the Railroad and Public Utilities Commission. Any power not legislative in character, which the legislature may exercise, it may delegate, and, before the court can properly declare a statute void for unauthorized delegation of legislative power, it must appear that the power delegated was legislative. 12 C. J., 840.

As said in *Leeper* v. *State,* 103 Tenn., 500, 53 S. W., 962, 48 L. R. A., 167, the legislature cannot delegate a power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its action depend.

This statute was complete when it left the legislature and required only the making and erection of the sign to give it effect. The designation of the uniform sign was no more a legislative function than the mechanical act of making and erecting it. Both acts were matters of administrative detail necessary to carry out the executive duty of giving effect to the statute. 12 C. J., 847.

In the exercise of the police power, it cannot be questioned that the legislature may pass statutes for the protection of travelers on highways at grade crossings over railroads. It could be done by amending the pertinent sections of the Code of 1858, which provided for the erection of signs by road overseers, officers no longer existing, and which compelled railroads to observe the signs

erected, or it could be done by an original act. But, when enacting such statute, the Constitution could not be violated.

It is insisted for appellant that chapter 41, Acts of 1921, provided a uniform railroad crossing sign for all crossings throughout the State, and the erection of signs under the act replaced those provided for in section 1223, Code of 1858, and made it obligatory upon the railroads to observe them as required in subsections 2 and 3, section 1166, Code of 1858. Chapter 41, Acts of 1921, cannot be read into section 1166. As an amendment of section 1166, subsections 2 and 3, Code of 1858, the act would violate article 2, section 17, of the Constitution which reads:

"No bill shall become a law which embraces more than one subject, that subject to be expressed in the title. All acts which repeal, revive or amend former laws, shall recite in their caption, or otherwise, the title or substance of the law repealed, revived or amended."

The first part of this section was intended to prevent the evil practice of enacting laws under titles that convey no real information of their purpose (*Cannon* v. *Mathes,* 8 Heisk., 518; *State* v. *Hayes,* 116 Tenn., 42, 93 S. W., 98), and to prevent the union in one act of unrelated objects (*Powers* v. *McKenzie,* 90 Tenn., 178, 16 S. W., 559; *Garvin* v. *State,* 13 Lea, 174). The second provision was intended to prevent the enactment of laws whose effect was unknown to the legislators and the people, by directing attention to the old law and the proposed change. The purpose of both provisions was to direct the attention of the legislators to the subject-matter of the act by reference to its title.

To construe chapter 41, Acts of 1921, as amending section 1166 of the Code of 1858, would bring it in conflict with the second of these provisions, because the title of the act does not recite the title or the substance of the law amended. As an act to provide for the erection of uniform signs at highway crossings and protect such signs by preventing the erection of confusing signs, it would not offend article 2, section 17, of the Constitution. Its one purpose would be to establish a standard railroad crossing sign, and make it accomplish the purpose intended by preventing the erection near it of confusing signs.

It is the duty of the court to give the act the interpretation that will save it if it can consistently be done. *Cole Manufacturing Co.* v. *Falls,* 90 Tenn., 469, 16 S. W., 1045. To give the act the effect, as a necessary police regulation, of providing a standard railroad crossing sign at all grade crossings, as a means of warning travelers of danger, would give it the force and effect given the local act in *Hurt* v. *Railroad,* 140 Tenn., 623, 205 S. W., 437.

In the development of the State, the highway system has developed under new statutes which provide no road overseer, and throughout the State there were, when the act was passed, railroad crossings in counties where the office of road overseer did not exist. Under acts subsequent to the Code of 1858, there was no official supplying the place of road overseer authorized to erect the ancient statutory sign. Chapter 41, Acts of 1921, was intended to supply the deficiency by supplanting the old statute, and was intended to restore the common-law rights and impose the common-law duties applicable to travelers on the highway and to those operating trains on tracks at

grade crossings, as such rights and duties existed prior to section 1166, subsections 2 and 3. Chapter 41, Acts of 1921, is so inconsistent with the provisions of the Code of 1858 dealing with the subject of erecting signs at railroad crossings as to repeal by implication section 1223, and subsections 2 and 3 of section 1166 of the Code of 1858.

It follows, therefore, that the effect of chapter 41, Acts of 1921, was to repeal by implication the last-mentioned provisions of the Code of 1858, and restore the common-law rights and the common-law duty of both travelers on the highways and the railroads at all grade crossings throughout the State, and the rights of plaintiff and the duties of the railroad are controlled by common-law negligence.

The accident in which Mr. Chandler lost his life occurred on the evening of December 31, 1924. According to the testimony of Miss Enoch, who was in a buggy a short distance behind the automobile when it was struck, the car in which deceased was riding passed her at a speed of fifteen or twenty miles an hour, and the train struck the car just about the time the car hit the rail. The engine struck the car on the right fender and knocked it into a ditch that ran parallel with the road, and across which a bridge or culvert extended to the edge of the railroad embankment. Miss Enoch heard the whistle blow a half a mile from the crossing, but says she did not hear it blow again. She saw the train before it reached the crossing, and testifies that the occupants of the car could not see it because their side curtains were up.

A man named Hutchens, who resided three hundred yards from the crossing, was in his back yard, and from there saw the train approaching, and the automobile coming toward the crossing. He says that persons traveling the road could see from a point thirty to fifty feet from the crossing, a distance of three hundred to four hundred yards down the track.

Interpreted in its application to the facts of this case, his testimony means that a person approaching the crossing in an automobile, if he had looked down the track at a point on the road from thirty to fifty feet from the crossing, could have seen the train at least three hundred yards before it reached the crossing. He testifies that the car in which deceased was riding was running as fast as it could go when it passed his place, and that, if it slowed down at all, it was running fast at the crossing. The car was coming from the east moving west, and the train was moving in an easterly direction, according to the testimony of this witness.

Jim Taylor, who lived one hundred yards from the crossing, testified that the whistle sounded away up the track. He did not see the accident.

Randle Redmond testifies that at a point from ten to twelve feet from the bridge one could see an approaching train. The bridge across the ditch was twelve feet long, and, adding this to the distance from which he says the train could have been seen, afforded an opportunity to see the train at a point twenty feet from the track had the persons in the car been looking. Upon the undisputed facts, plaintiff's intestate drove swiftly upon the railroad crossing without looking. Circumstances indicate that the occupants of the car were drinking or

drunk, which no doubt accounts for their reckless conduct.

The undisputed facts show that the death of plaintiff's intestate was the direct result of the negligence and lack of care on the part of the occupants of the car. Either of them could have seen the train at a point from twenty to fifty feet from the crossing at a distance of three hundred yards down the track, and could have heard it approaching if they had exercised ordinary care for their own safety.

The judgment of the trial court is affirmed.