\*AMERICAN STEEL & WIRE COMPANY *v.* R. A. SPEED,
Clerk.

*(Jackson.*   April Term, 1903.)

1. **TAXATION.** Manufacturing corporation of another State,
   selling and distributing its manufactured products from ware-
   houses here through its agent, is a merchant and taxable as
   such under statute.

   A foreign manufacturing corporation of another State, having an
   agent in this State, to whom it ships its manufactured products
   to be kept in stock in the agent's warehouses, and to be used to
   fill contracts of sales made by its traveling salesmen, or con-
   tracts made by certain intending purchasers by their depositing
   specifications of goods desired with the local agent, who had no
   authority to fix prices, but who had authority to deliver the
   goods so specified to certain local dealers previously designated
   by the said corporation, upon their filing such specifications, is a
   merchant dealing through such agency in the meaning and
   sense of our statute (Acts 1901, ch. 174, sec. 27) defining the
   term "merchant" as including all persons, copartnerships or
   corporations, engaged in trading or dealing in any kind of
   goods, wares, or merchandise, whether the same be kept on
   hand for sale, or be purchased and delivered for profit as or-
   dered, and is taxable as a merchant under said statute provid-
   ing that merchants shall pay an *ad valorem* tax upon the capital
   invested in their business equal to that levied upon other tax-
   able property. (*Post, pp.* 527-535, 538-542.)

   \*The American Steel and Wire Company carried this case, by
writ of error, to the supreme court of the United States where the
opinion and judgment of this court was in all respects affirmed, on
February 23d, 1904. See 192 U. S., p. 500.—Reporter.

American Steel & Wire Co. v. Speed.

Statutes cited and construed: Acts of 1901, ch. 174, sec. 27.

Cases cited and approved:   Webb v. The State, 11 Lea, 662; Kurth v. The State, 86 Tenn., 134.

Cases cited and distinguished:   State v. Smith, 5 Hum., 394; Taylor v. Vincent, 12 Lea, 284.

2.   SAME.   Same.   Interstate commerce clause of federal constitution not violated; goods not in transit. .

The manufactured goods of a manufacturing corporation of another State, shipped in large quantities, by taking advantage of high stages of water in the river, to its local agent here to be kept in stock in the agent's warehouses in anticipation of sales, and to be used to fill contracts of sales made by its traveling salesmen, or contracts made by certain intending purchasers by their depositing specifications of goods desired with the local agent who had no authority to fix prices, but who had authority to deliver the goods so specified to certain local dealers previously designated by such corporation, upon their filing such specifications, *are not in transit from one state to another,* for the reason that the goods have not been sold to any one, and the statute (Acts 1901, ch. 174, sec. 27) taxing the goods with a merchant's tax while thus stored, is not a violation of the federal constitution (art. 1, sec. 8, subsec. 3) empowering Congress "to regulate commerce with foreign nations, and among the several States, and among the Indian tribes," although an effort was generally made to secure agreement from intending purchasers to take the output of the corporation's mills before the goods were manufactured, there being usually enough of such contracts in existence, and calling for a sufficient quantity of goods to cover the expected output for sixty or ninety days, the time within which the purchasers were required to select the quality of the goods, the quantities of which and the prices of the different qualities of which were fixed by the respective contracts. (*Post, pp.* 527-535, 538-546.)

Statute construed: Acts 1901, ch. 174, sec. 27.

American Steel & Wire Co. v. Speed.

Constitution of the United States cited and construed:   Art. 1,. sec. 8, subsec. 3.

3. **SAME.** Same. Same. **Goods of nonresident owner are not: exempt from taxation when sold in original packages from mass of property in this State.**

The fact that the manufactured goods of a manufacturing corporation of another State are sold in the original packages does. not exempt it from taxation in this State on the goods stored and warehoused here for the purpose of sale in this State and other States, as shown in the foregoing headnotes, and which goods: are so dealt with as to make them a part of the common mass. of property in this State.   (*Post*, *pp.* 536-537, 546-547.)

Cases cited and approved:   Woodruff v. Parham, 8 Wall., 123; Hinson v. Lot, 8 Wall., 148; Brown v. Houston, 114 U. S., 622; Coe v. Errol, 116 U. S., 517; Pittsburg, etc. Company v. Bates,. 156 U. S., 577; Emert v. Missouri, 156 U. S., 296.

Cases cited and distinguished:   Brown v. Maryland, 12 Wheat.,. 436; Welton v. Missouri, 91 U. S., 275; Leloup v. Mobile, 127 U. S., 641; Asher v. Texas, 128 U. S., 129; Robbins v. Taxing District, 120 U. S., 489; Leisy v. Hardin, 135 U. S., 100; Lyng v. Michigan, 135 U. S., 161.

4. **SAME.** Same. Same. **Manufacturer of another State taxed as merchant here is not discriminated against, when.**

A merchant's tax levied against a manufacturing corporation of another State upon its business in selling its goods manufactured in other States, out of the produce of other States, massed, stored and warehoused in this State, for sale in this and other States, through its local agents and traveling salesmen, is not a discriminative tax, and the question of a discriminative tax does not arise because the tax is not a direct tax. (*Post*, *pp.* 547-548.)

Cases cited and approved:   Jenkins v. Ewing, 8 Heisk., 456, 484.

American Steel & Wire Co. v. Speed.

FROM SHELBY.

Appeal from the Chancery Court of Shelby County.—
F. H. HEISKELL, Chancellor.

PATTERSON, NEELEY & HENDERSON, for American Steel
& Wire Company.

Attorney-General CATES, CARROLL, MCKELLAR & BUL-
LINGTON, and GREER & GREER, for State.

MR. JUSTICE NEIL delivered the opinion of the court.

This suit was instituted in the chancery court of Shel-
by county to recover $1,031.44, a merchant's tax assessed
against complainant by R. A. Speed, clerk of the county
court of that county, and which was paid by complain-
ant, under protest, on the 18th of October, 1902. The
chancellor rendered a decree in favor of complainant,
and the cause is now in this court on appeal of the de-
fendant clerk.

The facts upon which the controversy arises are as
follows: Complainant is a corporation created under
the laws of New Jersey. Its situs is in the State of
New Jersey, and its principal business office is situated
at Chicago, Illinois. It is engaged in the manufacture
of nails, staples, barbed and smooth wire, at different

points north of the Ohio river.   None of its manufactories are situated in Tennessee, and all of its products consigned to Memphis are shipped from points beyond the limits of this State.

Prior to the 1st of February, 1900, its manufactured products were sold and distributed throughout the Southwest, from Louisville, Ky., Memphis, Tenn., Greenville, Vicksburg, and Natchez, Miss., and New Orleans, La.   About that time the Patterson Transfer Company, a corporation created under the laws of Tennessee, having its situs at Memphis, and doing business at Memphis, represented to appellee that Memphis was the most available point in the Southwest at which to mass and distribute its manufactured products to its customers in that section.   At this time and for many years prior thereto, the Patterson Transfer Company had been engaged in the business of transferring passengers and freights to and from the various depots at Memphis and from the landings on the Mississippi river.   Appellee entered into an arrangement with the Patterson Transfer Company whereby said company was to receive its manufactured products at Memphis, assort them so as to separate the different kinds of nails, staples, and wire, and then to deliver them either to the jobbers at Memphis, or to the jobbers beyond the limits of Tennessee, over the various lines of railroads and steamboats running into Memphis, as directed by complainant.

None of complainant's products are ever sold to the Patterson Transfer Company, or are by it sold to others,

and neither its officers nor employees have any knowledge whatever of the price at which goods are sold by complainant.

Under the arrangement between them, the business of the Patterson Transfer Company, in connection with complainant's products, is confined to their transfer to the warehouses, their assortment in the warehouses, the keeping of them in storage, and their subsequent delivery to the customers of the complainant, under its general or special orders, as below indicated.

The goods of complainant are manufactured at different points, and it is convenient and useful, from a business point of view, to mass them at some place at which they can be assorted, and from which they can be distributed to complainant's customers. It is impracticable to assort the goods either at the river landing or at the railroad depots when they reach Memphis, and, in order to facilitate the work, the Patterson Transfer Company has rented three warehouses in which the goods are stored for the purpose of assortment and distribution, and for other purposes below indicated. These warehouses are rented exclusively for this purpose, and the manufactured products of complainant, and no other goods, are stored therein.

The evidence further shows that, as a general rule, prior to the time the goods are shipped to Memphis, sales agents of the complainant canvass the Southwestern country, and make contracts, exclusively with jobbers;

110 Tenn—34

and in each instance where a contract is made it is em-
bodied in writing, on a form prepared by complainant,
in which is set down the amount of goods which con-
stitutes the subject of the contract, and the time agreed
upon within which they are to be delivered.  The goods
so contracted for are described as so many kegs of nails,
so many kegs of staples, so many reels of barbed wire,
or so many coils of smooth wire, according to the terms
of the contract, in respect of the quantity agreed upon.
But the contract does not specify the grade and quality
of the goods desired.  The grade and quality are left
open, to be subsequently specified when the customer de-
sires a delivery, as below stated.  The customer can,
when he makes his specification, select any grade of
goods he desires, and upon so selecting they will be de-
livered to him, up to the quantity contracted for, within
the time agreed upon, at prices contracted for applicable
to the several grades.  In fixing the price of its goods,
the complainant always, except when necessary to lower
prices in order to meet competition, figures in the freight
on the goods.

As above indicated, it is shown in the evidence that
there are many different kinds of nails, as well as differ-
ent kinds of barbed and smooth wire, and it is expressly
stipulated in the contract that the customer shall have
the privilege of specifying, during the life of the con-
tract, the kind of wire, or kind of nails or staples, he
desires delivered to him under the contract.  These con-
tracts also specify from 60 to 90 days as the time within

American Steel & Wire Co. v. Speed.

which the products are to be delivered, and, at any time during the period prescribed in the contract, the customer may designate the kind of goods he desires delivered under it.

These contracts are made, usually, before the goods arrive at Memphis, their point of destination, and generally the contracts are made in advance of the production of the goods at the complainant's factory.

Usually the sale agents of the complainant, not only in advance of the shipment of the goods, but in advance of their production, canvass the Southwestern country in the manner above stated, visiting the various jobbers, ascertaining the amount of goods they will require within 60 or 90 days, and the contract is prepared, to the purport above indicated, in which the complainant obligates itself to deliver, at the prices stated, as above mentioned, the amount of goods contracted for therein, and the customer agrees to receive and pay for that quantity upon the goods being delivered to him after he shall have made, and according to, his specification, which he may make during the life of the contract, the customer reserving the right, in the face of the contract, to specify the exact grade or quality of goods he desires delivered under it. He does this after the making of the contract, and at any time he desires to do so, within the life of the contract, by writing out his specification showing precisely what grade of goods he desires, and forwards this specification to the office of complainant in Chicago, and then the goods, under an order from the

Chicago office, addressed to the Patterson Transfer Company at Memphis, are selected by the latter out of the mass of goods belonging to the complainant in the aforesaid warehouses in Memphis, and are shipped by the said Patterson Transfer Company to the customer who has signed the specification. This order from the complainant to the Patterson Transfer Company is effected through the agency of a copy of the specification which is forwarded to the latter from complainant's central office at Chicago; it being understood, according to the course of business between the two companies, that the Patterson Transfer Company will select, out of the mass of goods, those set out in the specification, and will ship them to the customer whose name is signed to the specification, upon receiving such copy of the specification from the central office at Chicago.

This method of transacting the business is modified, in practice, in so for as the fulfillment of the contracts made with the jobbers at Memphis is concerned. For the convenience of the Memphis trade, complainant advises the Patterson Transfer Company of the names of its customers at Memphis, and that company is instructed to deliver the goods embraced in the contracts with the Memphis jobbers, in the following manner: The Memphis jobber makes out his specification in duplicate, and addresses a letter to complainant, as in any other case; but, instead of forwarding this letter and his specification directly to complainant, he delivers the letter to the Patterson Transfer Company, and the Patterson Transfer Company at once delivers the goods

American Steel & Wire Co. v. Speed.          .

so specified, attaching the dray receipt to a copy of the specification, and forwards the specification, letter, and dray receipt to the office of complainant in Chicago, and that office makes out an invoice and sends it directly to the jobber.

Another variation is made, in the course of the business, in favor of the Memphis jobbers, to the following effect:   Any jobber in Memphis who is a recognized customer of the complainant can, without any previous written contract or other special agreement, make out a specification of the goods he desires, and hand this, in duplicate form to the Patterson Transfer Company. Upon this being done, it is the duty of the Patterson Transfer Company, under its general instructions from the complainant, to select, out of the mass of goods in the warehouses, goods corresponding to those contained in the specification, and deliver them to such jobber, this delivery being usually made by the next day, or, at most, within two or three days.   Other deliveries on specifications sent direct to the Chicago office are not usually made within less than six or eight days, and sometimes a longer period is required.   When the Patterson Transfer Company receives from Memphis jobbers the specifications which are the special subject of this paragraph, one copy is kept by it, and the other copy is forwarded to the office at Chicago, where, upon its arrival and reception, the customer is charged with the goods specified, at current prices.

The testimony shows that, of the mass of goods kept

on hand in Memphis in the above-mentioned warehouses, about 90 per cent. ultimately goes to jobbers who reside outside of Memphis and beyond the limits of this State. The remaining 10 per cent. goes to the Memphis jobbers in fulfillment of the general contracts previously referred to, pursuant to specifications thereunder made, and under specifications made without previous written contracts, the latter covering about 2½ per-cent. of all the goods kept on hand.

No one but an agreed or recognized customer of the complainant can make out a specification, or have goods delivered from the storehouses of the Patterson Transfer Company; and no goods are ever delivered or distributed to any one by the Patterson Transfer Company except under the express directions of complainant, or under general directions given by complainant to the said Patterson Transfer Company in favor of recognized and approved customers of the complainant, whose names are furnished by it to the Patterson Transfer Company.

The testimony further shows that the quantity of goods which the complainant keeps on hand at Memphis fluctuates considerably, owing to the state of trade, from time to time. Sometimes the stock is as low in value as $30,000, and sometimes the complainant has on hand a stock of the value of more than $100,000.

Some of the goods, a very small amount, are shipped to Memphis by rail. Nearly all of these goods which come to the hands of the Patterson Transfer Company from this complainant are transported to Memphis on

barges belonging to transportation companies in which complainant has no interest, and which are engaged in the carrying trade. As a general rule, while the complainant endeavors to secure contracts covering its output before the goods are manufactured, yet it does not always do so, but, taking advantage of the seasons when there is a good stage of water in the rivers which must be used in floating its products from its mills to Memphis, it masses its goods at the latter point in anticipation of future sales.

The testimony shows that when goods are shipped from complainant's mills, consigned to Memphis, the Patterson Transfer Company is notified by the Chicago office that a certain quantity of complainant's products were shipped at a certain time on barges to the port at Memphis. These barges are met at the river landing by the Patterson Transfer Company, which receives the goods, transfers them to its warehouses, and assorts them. Then from time to time it ships the goods on specifications as before explained. On receiving the goods, they are credited to the complainant on the books of the Patterson Transfer Company, and, on being shipped out, they are charged on the same books to the complainant. When the goods reach Memphis they are always consigned to the complainant, in care of the Patterson Transfer Company.

All of the goods forwarded to Memphis are products of the factories of complainant. No part of them are ever purchased by it. Its sale agents are exclusively en-

gaged in selling these products. They are produced by complainant beyond the limits of this State, and are made the subject of contracts by its sale agents throughout the southwest in the manner before explained. These sale agents report all contracts effected by them directly to the office in Chicago, whether made with the jobbers at Memphis or elsewhere beyond the limits of this State. All invoices for goods, when sold by specifications in the manner above stated, are made out at the office at Chicago, and forwarded directly to the customer, in the manner and under the circumstances previously stated.

Some of complainant's goods are produced at one factory and some at another, and consequently, when a purchaser contracts for the delivery to him, within 60 or 90 days, of a certain number of packages, it frequently turns out that some of goods desired are the product of one factory and some of another, and it is accordingly most convenient, in the conduct of complainant's business, that goods from complainant's various factories should be massed at some point where they can be dealt with in the manner before explained.

Complainant's goods are put up in the following original packages. The nails and staples are put up in kegs, each keg weighing 100 pounds; the smooth wire in coils tied by wires, and each coil weighing 100 pounds; the barbed wire on reels, the wire on each reel weighing 100 pounds. Each package is separately and distinctly made up at the factories for convenience of transporta-

American Steel & Wire Co. v. Speed.

tion, and is in this form delivered to the common carriers. In this form they are delivered at the initial point of transportation. In this form they are transported in barges or by railroads to Memphis, and received by the Patterson Transfer Company. In this form they are assorted at the warehouses by the Patterson Transfer Company, and delivered by it to the complainant's customers at Memphis, under the circumstances previously stated, or to the various lines of steamboats and railroads running out of Memphis, consigned, under circumstances previously stated, to customers beyond the limits of Tennessee, and in this form they ultimately come to the hands of complainant's customers in such foreign States. Each package is separate and distinct in itself, and, while no particular package is consigned to any special customer, each keg of nails and staples is marked so as to show exactly what the package contains, and each coil and reel of wire is marked with a tag showing what the coil or reel contains, and no package is ever changed, in any particular, from the time it leaves the factory until it ultimately reaches the hands of the customer.

The testimony shows that Memphis has within recent years become, by reason of its accessibility to railway and river transportation, a great distributing point, and it was selected as the basis of the operations which are the subject of the present controversy, by reason of these exceptional advantages.

Other facts proven by the complainant are as follows: The testimony of Mr. Young, the tax assessor, shows that

none of the cotton shipped into Memphis from the surrounding States pays any tax whatever, and that the manufacturers of lumber in Memphis pay no tax on lumber made from logs which are produced from the soil of this State.

There is also an agreement of counsel to the effect that there are large iron deposits in Tennessee, and a number of furnaces in this State engaged in the manufacture of iron from the iron ore deposits in this State.

The bill alleges, and the answer admits, that complainant was assessed by the defendant clerk as a merchant, and was required to pay to the State a merchant's tax for the years 1901 and 1902, amounting to $1,031.44. On appeal to the State Board of Equalizers, this assessment was affirmed, and thereupon, within the time required by law, to wit, on the 18th day of October, 1902, complainant paid these taxes under protest. This suit was instituted by complainant, within the time prescribed by the statute, to recover the taxes so paid, on the ground that the assessment was illegal and void for the following reasons: (1) Because complainant was never at any time a merchant doing business at Memphis (2) That the assessment was in violation of article 1, section 8, subsection 3, of the constitution of the United States, which empowers Congress "to regulate commerce with foreign nations, and among the several States, and among the Indian tribes."

We shall now briefly consider the points raised in argument in this court.

American Steel & Wire Co. v. Speed.

It is insisted that the complainant was not a mer-chant; but we think it was a merchant within the sense and meaning of our Act of 1901, p. 329, c. 174, sec. 27. This section reads as follows: "The term 'merchant' as used in this act, includes all persons, copartnerships, or corporations engaged in trading, or dealing in any kind of goods, wares or merchandise, . . . whether such goods, wares or merchandise be kept on hand for sale, or the same be purchased and delivered for profit as ordered."

Under the facts proven in this case, the complainant was "dealing" in nails, staples, and wire, in the city of Memphis, at the time it was assessed for taxes, and had been since February, 1900, and for a short time prior thereto. It is immaterial that its agent at Memphis, the Patterson Transfer Company, had no authority to fix prices, but only kept the stock and delivered the goods on contracts made with the office at Chicago, said deliveries being made under orders issued from Chicago, either special, or to be inferred from the general course of business. The vital fact is that the goods were not sold from their place of manufacture, but were kept in stock at Memphis, and this stock was drawn on from time to time to fill contracts of sale made by the company's salesmen, or to fill contracts made by means of intending purchasers depositing specifications of goods desired with the Patterson Transfer Company, and in that manner obtaining the goods.

It is insisted that complainant was only a manufac-

turer selling its goods as any other manufacturer. In *Taylor* v. *Vincent,* 12 Lea, 284, 47 Am. Rep. 338, it is said that, if the manufacturer of an article be engaged in selling it as a business, he may be taxed for the privilege of doing so, as a tax upon his occupation, or as a privilege; but that if he sells from his place of manufacture in unbroken packages, as a manufacturer, he can not be taxed as a dealer. A later case (*Kurth* v. *The State,* 86 Tenn., 134, 5 S. W., 393) goes further and holds that a manufacturer of liquors cannot sell without taking out license as a dealer. This latter case had reference to sales at retail, but in another case (*Webb* v. *State,* 11 Lea, 662) the same rule was applied to manufacturers selling to wholesale liquor dealers. And in *Kurth* v. *State,* in referring to *Taylor* v. *Vincent,* it was said: "The case of *Taylor* v. *Vincent* is pressed upon us as determining that a dealer is one who buys to sell again. In this we do not concur. But this proposition is no part of the decision of the case, and was only used in argument by the judge delivering the opinion of the court. The decision in that case only goes to the point of deciding that, under the revenue laws of 1881 and 1883, a manufacturer of liquors from the produce of this State, who sold at his place of manufacture to dealers in unbroken packages, was not a wholesale dealer within the meaning of these acts." .

There is an earlier case (*State* v. *Smith,* 5 Humph., 394) construing Acts 1835-36, p. 61, c. 13, sec. 5, which takes the contrary view, but this is not controlling under

American Steel & Wire Co. v. Speed.

the language of the Act of 1901 and the later cases above referred to.

It is next insisted that the act taxing the goods was a violation of the provisions of the federal constitution above referred to, because the goods were in course of transit from one State to another at the time the tax was levied. We do not think that this position is well taken. Under the method of business pursued by the complainant, these goods had been sold to no one, nor were they in course of transit for the purpose of being put directly upon the market. The warehouse of the Patterson Transfer Company was in the nature of a permanent place of deposit, where complainant's goods were gathered together and were left to await the orders of customers, and from the mass so created goods were from time to time drawn to meet the wants of customers, and as called for by them. It is true than an effort was generally made to get agreements from intending purchasers that they would take the output of complainant's mills before the goods were manufactured, and that usually enough of these contracts were in existence, and calling for a sufficient quantity of goods, to cover the expected output for 60 or 90 days, the time during which these contracts usually ran; but these contracts did not constitute sales. They were only agreements to the effect that, during the 60 or 90 days next ensuing their date, such intending purchasers would take such and such a quantity of complainant's goods, say 1,000 kegs of nails, or 1,000 kegs of staples, or 500 coils of

wire. But there were many kinds and grades of nails,. and this class of goods varied very much in size, run- ning from four-penny to twenty-penny nails. There were also different grades of staples. And as to wire,. there were several kinds: First, the two general classes. of smooth wire and barbed wire, also wire galvanized,. and wire not galvanized. And in barbed wire there were different grades, based on the number of points or barbs, as two-point and three-point wire, etc.

Any customer of the complainant who had contracted to take a given quantity of complainant's nails, as 1,000 kegs, had the right to select, at any time within the 60 or 90 days covered by his contract, the kind of nails he would take. He might, if he chose, call for and receive all of one kind, or some of each kind, or in any propor- tion, as respects the several kinds, that he desired. So with the staples. And so of the wire. He might specify, during the 60 or 90 days, so many coils of smooth wire galvanized, so many coils not galvanized, so many reels of barbed wire two-point, and so many reels of barbed wire three-point. At the time these con- tracts or agreements were entered into, neither the com- plainant nor its customers knew how much of any kind of complainant's goods would be called for. Hence there was no meeting of the minds of the parties as to an es- sential term of the contract. These contracts were noth- ing more than options extended to complainant's cus- tomers to select from complainant's stock of goods, with- in a given time, such articles as they might desire, up to

and not to exceed an agreed quantity, the price of each article (kegs of nails, kegs of staples, coils of wire, and reels of barbed wire) composing the mass being fixed for the time agreed upon, and the customer being allowed to select within the time such articles as he desired, with the understanding that they were to be charged to him at the price ruling, as per agreement, during the 60 days or other time agreed upon. Nor was the customer under the contract bound to take all of the goods at one time. He had the right, according to the contract and the usage of the business, to specify and select all at one time, or to specify and select different parts of the agreed aggregate, for the 60 or 90 days, at different periods, or on different days during that period.

The substance of the contract, agreement, or arrangement between the complainant and any given customer may be thus expressed: On his part, the customer said: During the next 60 days, I will take from you 1,000 kegs of nails, or 1,000 kegs of staples, and 1,000 coils of wire, reserving to myself the right to select from the mass of your goods such and so much of the many different kinds of goods which you have of the classes referred to as I may desire, provided I do not go beyond the aggregate quantity of each general class (nails, staples, and wire) above indicated; the price for each of the several grades and kinds of the several classes of goods to be thus and thus.

Or, to state the matter from the complainant's point

of view, the substance of the negotiation between the parties, in general, may be thus set down, viz.: During the next sixty days I will sell you my goods at the following schedule of prices (stating prices); what quantity will you take during that period? The customer replies, in substance, I will take 1,000 kegs of nails, 1,000 kegs of staples, and 1,000 coils or reels of wire, of such kinds as I may specify of the several kinds or grades of nails, and of the several kinds of staples, and of the several kinds of wire, during the next 60 days, at the prices offered. Here it is manifest that there being no agreement as to the amount of each kind or quality of goods in advance, and there being no means of making certain these matters, except through the uncontrolled choice of the customer, there can be no means of determining the sum due until there is a selection made by the customer in any given instance.

As appears from the statement of facts above, complainant has all the time a large number of such contracts running in this State, and in Arkansas, Texas, and other States in the Southwest, and keeps on hand its stock of goods to meet them, that is, to fill such orders or "specifications" as its customers may from time to time make, the orders, in general, being sent to complainant's Chicago office, and from that office the directions being sent, in the manner set forth in the statement of facts, to the Memphis branch, to fill the orders by shipping the goods to the customer so ordering or "specifying."

Likewise, as appears from the said statement of facts, complainant, from time to time, as occasion offers, has through its agent, the Patterson Transfer Company, dealings with its recognized customers among the merchants of Memphis, without the formality of such previous written contracts, allowing these merchants to select or "specify" whenever they desire goods, and imposing upon the Patterson Transfer Company the duty to deliver promptly to such merchants, whenever calls are made, without any previous notification to the office at Chicago or negotiations therewith.

The goods kept on hand at Memphis in the stock referred to must be regarded as kept on hand for this purpose also.

And it is important at this juncture to note, as shown in the statement of facts, that the fact last stated is not the only evidence that the goods are not massed at Memphis merely for the purpose of meeting the general contracts, above referred to, previously made in and through the Southwest; on the contrary, as previously stated, it appears that the complainant takes advantage of the stages of the water, in the rivers over which it ships its goods in barges, to float down large quantities of its goods in anticipation of sales, and to have them ready against a time when the waters may be so low that shipments cannot be made by that means, but only by the more expensive method of railroad transportation.

We do not think that under these circumstances it can

110 Tenn—35

be justly said that the goods were in transit from one State to another when the tax was assessed.

It is next said that the complainant was not liable to taxation on its goods, because they were sold in the original packages. We do not think that this is a sound view, because the facts above stated show that complainant's goods were put up for sale in Memphis, and were so dealt with as to make them a part of the common mass of property in the State. *Brown* v. *Houston,* 114 U. S., 622, 5 Sup. Ct., 1091, 29 L. Ed., 257; *Pittsburgh, etc., Co.* v. *Bates,* 156 U. S., 577, 15 Sup. Ct., 415, 39 L. Ed., 538; *Woodruff* v. *Parham,* 8 Wall., 123, 19 L. Ed., 382; *Hinson* v. *Lott,* 8 Wall., 148, 19 L. Ed., 387; *Coe* v. *Town of Errol,* 116 U. S., 517, 6 Sup. Ct., 475, 29 L. Ed., 715. And see *Emert* v. *Missouri,* 156 U. S., 296, 15 Sup. Ct., 367, 39 L. Ed., 430.

Much stress is laid by complainant's counsel upon *Brown* v. *Maryland,* 12 Wheat., 436, 6 L. Ed., 678; *Leisy* v. *Hardin,* 135 U. S., 100, 10 Sup. Ct., 681, 34 L. Ed., 128; *Lyng* v. *Michigan,* 135 U. S., 161, 10 Sup. Ct., 725, 34 L. Ed., 150; *Welton* v. *Missouri,* 91 U. S., 275, 23 L. Ed., 347; *Robbins* v. *Shelby County Taxing District,* 120 U. S., 489, 7 Sup. Ct., 592, 30 L. Ed., 694; *Leloup* v. *The Port of Mobile,* 127 U. S., 641, 8 Sup. Ct., 1380, 32 L. Ed., 311; and the case of *Asher* v. *Texas,* 128 U. S., 129, 9 Sup. Ct., 1, 32 L. Ed., 368. We do not think there is any real conflict between any of these cases and those which we have cited in support of our conclusion, nor have the cases which we have cited ever been overruled by the

supreme court of the United States. We are also referred by counsel for complainant to several cases decided by the courts of other States upon the federal questions involved, but these are, of course, not controlling on such questions, and they need not be specially examined or commented upon.

From some of the evidence which was introduced by the complainant, and which we have referred to in the last part of the statement of facts, it would seem that the complainant intended to support the contention that the tax assessed against it was a discriminative one in favor of goods manufactured out of the produce of this State, and against those manufactured out of the produce of other States. There was such a contention made in the bill, but it is unnecessary now to go into this question at all, because the complainant concedes that if it is to be or rather can lawfully be, treated as a merchant, then the objection could not apply, because there is no discrimination in this State in respect of the origin of goods when they are in the hands of merchants. *Jenkins* v. *Ewin,* 8 Heisk., 456, 484. Complainant concedes that such contention could be raised only against a direct tax, and there is no such tax involved in this case. The tax assessed must stand or fall as a merchant's tax. Hence the question of a discriminative tax does not arise in this case, and need not be considered. The tax which is under consideration in the present case has no element of discrimination against the complainant as a

foreign dealer or otherwise, and hence cannot be objected to on that ground.

It results that the decree of the chancellor must be reversed, and the bill dismissed, with costs.