AMERICAN BOOK COMPANY *v.* P. A. SHELTON, Clerk of County Court.

(*Nashville.*  December Term, 1906.)

1. **TAXATION.** Foreign corporation furnishing school books under contract with the State is not a public and governmental agency exempt from taxation on its business and property here.

A corporation of a sister State engaged in the publication of schoolbooks, and under contract with this State to furnish certain schoolbooks for use in its public schools as provided by statute (Acts 1899, ch. 205), selling and distributing the books by and through agencies and depositories established here, is not a public agency of the State, endowed with governmental or public functions, to effect and carry out the State's public policy with reference to its schools, and is, therefore, not exempt from taxation under a statute (Acts 1903, ch. 258, sec. 2), exempting all property of the State, counties, and cities, used exclusively for public purposes.  (*Post, pp.* 746-765.)

Acts cited and construed:  1889, ch. 205; 1903, ch. 258, sec. 2.

Cases cited and approved:  Wilson v. Gaines, 9 Baxt., 551; Railroad v. Hodges, 7 Lea, 665; Memphis v. Bank and Insurance Co., 91 Tenn., 546; Memphis v. Insurance Co., 91 Tenn., 566; Turnpike Cases, 92 Tenn., 369; State v. Bank, 95 Tenn., 221; Bank v. Memphis, 116 Tenn., 641; Insurance Co. v. State of Tennessee, 161 U. S., 174; Bank v. Smith, 7 Ohio St., 42.

Cases cited and distinguished:  Nashville v. Bank, 1 Swan, 269; Nashville v. Smith, 86 Tenn., 213; Smith v. Nashville, 88 Tenn., 464; Dispensary v. Thornton, 106 Ga., 106; Sheffield v. Dispensary, 111 Ga., 1.

2. **SAME.** Same. Such corporation is subject to taxation as a merchant on books kept here for sale.

Such corporation doing business as stated in the foregoing head-

note is a "merchant" doing business within the State as de-
fined by statute (Acts 1903, ch. 258, sec. 27), and is, there-
fore, liable to an *ad valorem* tax on the average value of its
capital invested in the stock of merchandise kept on hand for
sale within the State, and also to a privilege tax of fifteen
cents on each one hundred dollars' worth of taxable property as
provided by statute (Acts 1903, ch. 257, sec. 3). (*Post, pp.*
765-771.)

Acts cited and construed:  1889, ch. 205; 1901, ch. 128, sec. 3;
1901, ch. 174, sec. 27; 1903, ch. 257, sec. 3; 1903, ch. 258, sec.
27.

Cases cited and approved:  Jenkins v. Ewin, 8 Heisk., 456; Kelly
v. Dwyer, 7 Lea, 183; Steel & Wire Co. v. Speed, 110 Tenn.,
524.

---

## FROM DAVIDSON.

---

Appeal from the Chancery Court of Davidson County.
—John Allison, Chancellor.

John J. Vertrees, for complainant.

Attorney-General Cates, E. E. Barthell and L. A.
Ligon, for defendant.

---

Mr. Justice McAlister delivered the opinion of the
Court.

Complainant filed this bill to recover the sum of
$82.21, State and county taxes, which it paid to the clerk

of the county court of Davidson county under protest.

The theory of the bill is that the taxes were illegally assessed and complainant was not liable as matter of law for their payment. The chancellor decreed in favor of complainant. Defendant appealed, and has assigned errors. The case is before this court on a stipulation of agreed facts.

The American Book Company is a corporation organized and existing under the laws of the State of New Jersey, with power to manufacture and deal in books of all kinds. In 1899 it made and entered into a contract with the State of Tennessee under chapter 205, p. 423, of the Acts of 1899, for the supply of certain schoolbooks, pursuant to the terms of that act, to the school children of the State. This contract expired in September, 1904, and thereupon the book company entered into another contract with the State of Tennessee by which the provisions of the former contract were renewed and enlarged for another term of five years beginning September 1, 1904, and being now in force.

It is then stipulated as follows:

"(1) Pursuant thereto and in accordance therewith, the American Book Company established a depository in the State of Tennessee at Nashville, in Davidson county, in that State. It made the Marshall & Bruce Company its depository, as above stated, and by written contract with said company, entered into on the 15th day of August, 1904, it agreed not to supply said books to any other dealer in any of certain counties in Middle

Tennessee which were enumerated. It further obligated itself to ship to said Marshall & Bruce, during the first year of said State contract, supplies of said books sufficient to meet such demands therefor in said counties as shall be reported to it by said Marshall & Bruce upon a consignment account upon the following terms and conditions as to prices and payments, which were then specified.

"(2)   The said Marshall & Bruce, in consideration thereof, agreed, first, to establish and maintain in each of said counties not less than one nor more than four agencies, as may be required from time to time by the schoolbook commission under said act for the sale and distribution of said books, and to see to it that said Marshall & Bruce and all such agencies complied with all the provisions of said act and of said State contract, etc.

"(3)   To order from said American Book Company and keep in the depositories at Nashville and in said agencies a stock of said books sufficient to supply all demands, and to sell said books to the pupils and patrons of the public schools at the retail prices printed thereon and no other, and at the exchange price herein stated to those pupils who give in exchange corresponding old books of same kind and grade as in actual use in the schools during the exchange period established by said act and said contract and this contract, but no exchange shall be made after the expiration of said exchange.

"(4)   To sell only new and no second-hand copies of

said text-books, and only for the purpose of said Tennessee contract, and not to sell any of them to any persons outside of said counties, or of said State, or to any one who, it has reason to believe, buys to so sell.

"It was further agreed between the parties, first, that all books placed with the said party of the second part at any time during this contract, or under its terms, shall at all times be on consignment, the title thereto shall remain in said first party, and that said books, until sold under the provisions hereof, shall be subject to the order of the American Book Company.

"(5)   Upon the execution of said contract, and after the said contract with the State went into effect, the book company began to and did deliver and supply the Marshall & Bruce Company with the said books in said contract mentioned and from time to time needed, and during this time has kept a greater or less number of the books on hand with the said Marshall & Bruce Company as its depository.  It has not, during any of said years, kept with them, or at any other depository, or at any other branch place of business in the State of Tennessee, any other books than those called for by its contract with the State of Tennessee, nor has it kept them at any other place than with its depository.  Neither has the book company placed with or delivered to or kept at the Marshall & Bruce Company any other books than books of the character above mentioned.

"(6)   The Marshall & Bruce Company upon its part has designated certain agencies in the counties named

in the contract with them for the distribution of said books, said agents or agencies in all cases being merchants at such places doing business for themselves as merchants where located, excepting that its business for the counties of Smith, Putnam, Cumberland, Fentress, Overton, Clay, and White, is handled by an agent through a subdepository at Cookville, which agent or subdepository is not a merchant and does not pay taxes or license."

The theory of the revenue agent is that the American Book Company is doing business in the State of Tennessee as a merchant, within the definition of that term found in section 27, c. 174, p. 329, Acts of 1901, and chapter 258, p. 655, Acts of 1903, as follows:

"Section 27. That merchants shall pay an *ad valorem* tax upon the capital invested in their business equal to that levied on taxable property. The term 'merchant' as used in this act, includes all persons, common partnerships, or corporations engaged in trading or dealing in any kind of goods, wares and merchandise, either on land or in steamboats, wharf boats or other craft stationed or plying in the waters of this State and confectioners, whether such goods, wares or merchandise be kept on hand for sale, or the same be purchased and delivered for profit as ordered."

Counsel also relies on the case of *American Steel & Wire Co.* v. *Speed*, 110 Tenn., 524, 75 S. W., 1037, 100 Am. St. Rep., 814, wherein this court, in applying this statutory definition of a merchant, held that "a manufac-

turing corporation of another State, selling and dis-
tributing its manufactured products from warehouses
here through its agent, is a merchant, and taxable as
such under our statute."

A very able argument has been submitted on behalf
of the American Book Company to show that the said
company is not doing business as a merchant in the State
of Tennessee; and, while conceding that the legislature
might tax its business, it is earnestly insisted there is no
authority in our statute law for the assessment and col-
lection of such a tax.

It is said that the American Book Company is not
doing business in Tennessee in any way whatever, unless
the keeping of books at its depositories in accordance
with the requirements of the schoolbook law is doing
business in Tennessee within the meaning of the revenue
laws of the State.   Liability for these taxes is denied on
two grounds:

First.  "In the matter of supplying these books the
American Book Company bears the relation to the State
of a public agency established to effect and carry out the
public policy of the State with reference to its schools,
and the revenue laws impose no tax upon such instru-
mentalities or agencies as the American Book Company
has the form of in its relation to the State under the
statute and its contract."

Second.   "The book company has not been doing bus-
iness in Tennessee within the meaning of the revenue
law.  It has merely been performing and complying with

its contract with the State, made pursuant to a public statute."

In support of the first proposition, it is said by eminent counsel on the brief as follows:

"The constitution of Tennessee, declares that it shall be the duty of the legislature to cherish literature and science, and it has established a perpetual fund for the use of the common schools of the State. It recognizes the principle that the schools in which are trained the children who are to be the men of the future, and the rulers of the commonwealth, are matters of State jurisdiction. Books are peculiar to schools, and schools are the property of the State. *Leeper* v. *State,* 103 Tenn., 536, 53 S. W., 962, 48 L. R. A., 167. The State has the power either to publish the books to be used in the public schools, itself, and sell them to the children, or patrons, or it may authorize others to furnish them; and it may prescribe the terms on which this shall be done. For the legislature to provide that by means of a contract a particular person shall have the right, upon prescribed conditions, to furnish books for use in public schools, is but an exercise of the police power of the State. *Leeper* v. *State,* supra.

"Consequently, when Tennessee, through its legislature, provided that the schoolbooks for the use of the children of the public schools should be furnished by persons under rules and regulations prescribed by law, it exercised its police power with respect to the public schools, the property of the State. In authorizing and

permitting others to furnish the books under statute-prescribed regulations and the control of its own book commission, the State merely employed these persons as instruments to do that which it was under obligation to do in some form itself. By virtue of the prescribed statutory contract, the persons furnishing schoolbooks for the public schools are placed in the relation of public agency to the State. All this was done by the legislature, not merely to obtain school books, for the world is full of publishers anxious to furnish them, but principally in order to secure books of proper character at the lowest price possible. . . .

"Under the circumstances, a tax upon the book concerns that have contracted to furnish schoolbooks, for furnishing them, is obviously a tax upon an agency or instrumentality of the State itself, and, of course, increases the price of the books, and therefore defeats the principal object of the law, to the extent of the amount of the tax."

Counsel, in concluding the statement of his position on this branch of the case, says:

"In complying with this statutory contract, the book company is not liable to taxation, because no other agency or person standing in the relation of agency is at present taxed by the laws of Tennessee. We do not insist that such a tax could not be imposed. Our insistence is merely that no such tax has been imposed."

In view of this insistence on the part of learned coun-

117 Tenn—48

sel, it is important to understand at the threshold of this investigation the *status* of the book company and its precise relation to the State of Tennessee under its contract.

The State of Tennessee, through its legislature, having determined that a uniform text-book system for the use of the scholastic population of the State would be conducive to the ends of public education, on April 4, 1899, enacted (Acts 1899, p. 423, c. 205) a statute containing, among other provisions, the following:

"Section 1.   That the governor and state superintendent of public instruction, together with three members of the State board of education to be named by the governor, shall be and are hereby constituted a State text-book commission, whose duty it is to select and adopt a uniform series or system of text-books for use in the primary and secondary schools in the State of Tennessee, and for use in the incorporated cities or towns in the high grade common schools.   Said commission is hereby authorized, empowered, and directed to select and adopt a uniform system or series of text-books for use in the public schools in this State, as above indicated, and when so selected and adopted, the text-books shall be used for a period of five years, in all the public schools of this State, and it shall not be lawful for any school officer, director or teacher, to use any other books upon the same branches other than those adopted by said State text-book commission. . . .

"Sec. 2.   That said text-book commission shall, im-

mediately after the passage of this act, meet and organize, the governor being *ex officio* president of the commission, and the commission shall elect its secretary. As soon as practicable, not later than thirty days after its organization, the commission shall advertise in such manner and for such length of time and at such places as may be deemed advisable, that at a time and place fixed definitely in said advertisement, sealed bids or proposals will be received from the publishers of school text-books for furnishing books to the public schools in the State of Tennessee, through agencies established by said publishers in the several counties in the State as may be provided for in such regulations as said commission may adopt and prescribe. The bids or proposals to be for furnishing the books for a period of five years and no longer, and that no bid for a longer period would be considered."

Section 6 of this act, among other provisions, contained the following:

"And it is further expressly provided that any person, firm or corporation now doing business or proposing to do business in the State of Tennessee shall have the right to bid for the contract to be awarded herein in the manner as follows," etc.

"Sec. 8. The party or parties with whom the contract shall be made shall establish and maintain in some one city in each of the three grand divisions of the State, a depository to be designated by the commission where a stock or supply of the books sufficient to meet all de-

mands shall be kept. There shall also be maintained in each county of the State, provided the commission shall deem it advisable, and shall demand, not less than one nor more than four agencies for the distribution of the books to the patrons, or the contractor shall be permitted to make arrangements with merchants or others for the handling and distribution of the books."

Section 15 of the same act provides as follows:

"Any dealer, clerk or agents, who shall sell any book for a greater sum than the contract price shall be guilty of a misdemeanor, and upon conviction shall be punished as provided in section 13· of this act."

In pursuance of the provisions of this act, the American Book Company in 1899 made a contract with the State by which it agreed to furnish said books for the term of five years, which books, under the provisions of said act, were required to be used in all the public schools of the State. In 1904, that contract expired, and on July 21 of that year, another contract was entered into for a term of five years awarding to the American Book Company the exclusive right to furnish said schoolbooks. Under said contract, the American Book Company appointed Marshall & Bruce its general depository at Nashville, in said State, for the distribution of text-books under said act and contract throughout certain counties in Tennessee, therein enumerated, being thirty in number. The American Book Company thereby obligated itself not to supply said books to any other dealer in any of said counties.

Article 2 of the contract provides:

"That said first party [the book company] hereby agrees to ship to the second party at Nashville [Marshall & Bruce], freight to Nashville paid, during the five years of said State contract, supplies of said books sufficient to meet such demands therefor in said counties as shall be reported to it by the second party, upon a consignment account, upon the following terms and conditions as to prices and payments."

Item 1 of article 3 of the contract requires Marshall & Bruce "to establish and maintain in each of said counties not less than one nor more than four agencies as may be required from time to time by the schoolbook commission under said act for the sale and distribution of said books."

Item 2 of article 3 of the contract requires Marshall & Bruce "to order from said first party from time to time, and keep in the depository at Nashville and in said agencies, a stock of said books sufficient to supply all demands, and to sell said books to the pupils and patrons of the said public schools at the retail prices printed thereon."

Item 3 of article 3 binds Marshall & Bruce Company "to sell only new and no second-hand copies of said textbooks, and only for the purpose of said Tennessee contract, and not to sell any of them to any persons outside of said counties or of said State, or to any one who, it has reason to believe, buys to so sell.

Item 4 of article 3 of the contract required Marshall

& Bruce Company "to protect said consigned books by good and sufficient insurance against loss by fire and water, loss, if any, payable to said first party [American Book Company], and to protect said stock against damage or injury of any kind during the consignment period, and to pay the first party for any damage of any kind to said books occurring while within its possession, or that of its agencies or agents, or in transit to said agencies or agents."

Item 5 binds Marshall & Bruce Company to furnish a bond for the faithful performance of the contract. The contract contains this further provision:

"The parties hereto further agree that all books placed with the second party at any time during this contract or under its terms shall at all times be on consignment, the title thereto shall remain in said first party and that said books, until sold under the provisions hereof, shall be subject to the order of the first party."

In obedience to the terms of this contract the Marshall & Bruce Company established two hundred and forty agencies for the sale of these text-books in the various counties enumerated in the contract, twenty of which agencies were located in Davidson county. It further appears that all of said county agencies were supplied with books from Marshall & Bruce Company, the depository at Nashville, and made their settlements with said firm under this arrangement, and in accordance with the provisions of the contracts large numbers of school-

books were sold to the children of the public schools of the State.

The agreed case recites:

"In Nashville the said agencies sold to their consumers or patrons any of the said books that may be called for without inquiry as to whether they are to be used for the public schools, and, so far as known, all books so sold are purchased and used for the education of the children of Tennessee."

Now, in view of the provisions of the statute and the stipulations of the contract from which we have extensively quoted, as well as the practical interpretation of the contract by the acts of the parties, we are unable to perceive that the American Book Company has been constituted a public agency of the State, endowed with any governmental or public functions. It is simply a private corporation doing business in this State for its own private emolument, and not in the discharge of any public duties.

As a result of competitive bidding it has been awarded a large and valuable contract by the State for the sale of text-books, not to the State, but to the school children of the State, and enjoying under its contract an exclusive privilege of sale and monopoly of the market. In fact, the act of assembly under which this contract was awarded provides in section 6 that any person, firm, or corporation now doing business or proposing to do business in the State of Tennessee shall have the right to bid, etc.

In other portions of the act these persons are referred

to as dealers, and we do not think it could have been in the contemplation of the legislature to constitute the successful bidder a public or governmental agency.

Counsel, in support of his contention, refers to the case of *Mayor* v. *Bank of Tennessee,* 1 Swan, 269, in which it was adjudged by this court that two lots owned by the Bank of Tennessee were not subject to taxation upon the ground that the Bank of Tennessee was a public corporation chartered for the benefit of the State. The court said:

"Its capital stock is owned by the State, consisting, as it does, of the school fund, certain revenue of the general government on deposit with the State for its use and benefit, and specie raised on the credit of the State by sale of its bonds. No portion of its stock is private. It is, therefore, a public corporation acting upon the funds and credit of the State in conformity to its charter for the public convenience and advantage. To enable it to accomplish the purpose for which it was intended, it may hold land for its immediate use, or such as may be taken in payment or security of its contract in its legitimate business. In its charter a very extended and important policy was contemplated, having relation to the currency, to external improvements, to common schools, and the relief of the people to some extent from the burden of taxation. . . . It is true that the corporation holds and represents the legal title to the property and effects of the bank, the better to enable it to accomplish the purposes for which it was

created; but, as the bank itself is a public institution, its lands and effects must necessarily be considered as the public property of the State.

"If this be a correct statement of the nature and character of the Bank of Tennessee, the conclusion is inevitable that the corporation of Nashville has no power or authority to levy a tax upon its property. . . . Nor can we see how public property can in any just sense be considered as a source of revenue to be derived by the exercise of the taxing power; for it was by the exercise of that power that it was separated from private property, and became public."

But we are of opinion that this case is not controlling in the present instance, since we fail to find any attributes of a public or governmental agency in the American Book Company under its contract with the State of Tennessee. It was purely a contractual relation.

Counsel also cite the case of *Dispensary Commission* v. *Thornton*, 106 Ga., 106, 31 S. E., 733, where it was sought to collect a liquor dealer's tax on dispensaries established in the State of Georgia for the sale of whisky. It was adjudged that the dispensary was a public agency of the State, that it was run by public officers, and that under existing laws they were not taxable. It appears that subsequently a law was enacted expressly taxing such dispensaries, and the tax was sustained. *Sheffield* v. *Dispensary*, 111 Ga., 1, 36 S. E., 302.

We fail to perceive, however, any analogy between a tax on publishers for the sale of text-books to the school

children of the State under an act of the legislature and a tax on a dispensary established by a State in the exercise of its police power for the sale of whisky by officers appointed by the State. In fact, the State itself was the proprietor of the dispensary in the cases cited, and might or might not tax them as it saw proper.

In *State National Bank* v. *City of Memphis*, 116 Tenn., 641, 94 S. W., 606, it was insisted that State bonds are inherently exempted or nontaxable on the theory that the State would not have the right to tax its own obligations in the hands of its creditors. The court said:

"Under the constitution of 1834, it was held that there was an implied exemption of said property (*Nashville* v. *Bank*, 1 Swan, 269), on the principle that it could not be supposed that the State would do so idle a thing as to tax itself for its own benefit, or that it would take money out of its treasury to be returned immediately thereto, or that it would permit a subordinate political division to impose such a burden upon it. It was said that the presumption was against the existence of any such contention. This case was followed and applied under the constitution of 1870 in respect of municipal property." *Nashville* v. *Smith*, 86 Tenn., 213, 6 S. W., 273; *Smith* v. *Nashville*, 88 Tenn., 464, 12 S. W., 924, 7 L. R. A., 469.

This court quoted with approval the following language from *Champaign County Bank* v. *Smith*, 7 Ohio St., 42, as follows:

"We readily concede that the State cannot affect the

obligation of a contract to which she is a party further or otherwise than in case of a contract between other parties. But the claim here is that the State should confer a bonus upon her bondholders; for the exemption of money invested in her bonds from the burden of taxation common to all other property within the State would be a substantial and valuable bonus. In the absence of any such express stipulation in the contract, we do not perceive an equitable foundation upon which to rest a claim to an exclusive privilege so directly interfering with the sovereign power of the State. . . .

"The principle that, in the absence of any stipulation to the contrary, a sovereign State possesses the power of taxing all property held under it and within its jurisdiction, is fundamental and essential to the very being of government. Property can only be acquired and held subject to this condition, and this infirmity of tenure, if it be one, furnishes the only adequate means for its protection."

This court held the State bonds taxable, and said, further:

"The argument that a decision holding the bonds taxable will decrease their value we do not think entitled to much weight, since the same is true of all property."

If the State may exercise the taxing power against public securities issued by it in the payment of its obligations and in the maintenance of its public credit, it would seem very illogical to hold that it cannot impose an *ad valorem* tax on the average capital employed by one

in doing business in this State under a contract with the State.

As is well said on the brief:

"If the fact that the book company has a contract with the State gave it immunity from taxation, the same rule would likewise exempt a manufacturer who might sell clothes for the convicts, the stationer who furnishes supplies to the State officers, and the printer who publishes the proceedings of the legislature or the supreme court reports, and apply to the ice dealer who purchases his stock from the board of prison commissioners, to the coal dealer who procures his coal from the State commission, and to the dealer in hosiery who buys the output of the prison factory."

It is most manifest that the stocks of merchandise belonging to the American Book Company in the State of Tennessee, upon which an *ad valorem* tax is laid, do not belong to the State of Tennessee, nor to any county or municipal corporation of the State, nor are they used exclusively for public or governmental purposes, and therefore this class of property is not embraced within section 2, c. 258, p. 632, Acts of 1903, which provided:

"Sec. 2. That the property hereunder enumerated and none other shall be exempt from taxation:

"(1) All property of the United States, all property of the State of Tennessee, of any county of said State, or of any incorporated city, town, or taxing district of the State that is used exclusively for public or municipal corporation purposes."

Says Cooley on Taxation, vol. 1, p. 356:

"As taxation is the rule and exemption the exception, the intention to make an exemption ought to be expressed in clear and unambiguous terms. It cannot be deemed to have been intended when the language on which it depends is doubtful or uncertain, and the burden of establishing it is upon him who claims it." *Phoenix Ins. Co. v. State of Tennessee*, 161 U. S. 174, 16 Sup. Ct., 471, 40 L. Ed., 660; *Wilson v. Gaines*, 9 Baxt., 551; *Railroad v. Hodges*, 7 Lea, 665; *Memphis v. Bank & Ins. Co.*, 91 Tenn., 546, 19 S. W., 758; *State v. Bank*, 95 Tenn., 221, 31 S. W., 993; *Turnpike Cases*, 92 Tenn., 369, 22 S. W., 75; *Memphis v. Phoenix Ins. Co.*, 91 Tenn., 566, 19 S. W., 1044.

But it is insisted on behalf of the book company:

"That the effort is, not to impose an *ad valorem* tax on the books, but a privilege tax on the company for doing business as a merchant at Nashville, Tennessee. It is conceded that, if the book company were really doing business here within the contemplation of the revenue laws, it would be liable for a privilege tax, whether it actually kept books in stock in Tennessee or not. The mere fact that a nonresident has chattel property here does not in any case make him liable for a privilege tax. There must be something more. He must be doing business; that is, be dealing in or selling books or other articles of merchandise after the manner in which a merchant does business."

As already stated, it is insisted on behalf of the county

court clerk that the American Book Company is doing business in the State of Tennesse as a merchant within the meaning of that term as expressly defined by the legislature, and that it is liable to a privilege and *ad valorem* tax upon the average capital invested by it in its business in this State.

The stipulation of agreed facts shows that the average value of the books on hand in Tennessee at the Nashville depository and its agencies was as follows:

For the year 1903 ........................$ 1,315 76
  "   "   "   1904 ........................  7,554 04
  "   "   "   1905 ........................ 13,449 81
  "   "   "   1906 ........................ 13,449 81

$35,769 42

The assessment, however, made by the county court clerk for State and county taxes due on stock of merchandise or capital invested in the same in Davidson county, was as follows:

AMERICAN BOOK COMPANY.

| Year. | Assm't. | State Tax. | County Tax. | Int. | Pen. | Costs. | Total. |
|---|---|---|---|---|---|---|---|
| 1903 | $  116 00 | $2 90 | $  3 37 | $1 12 | $1 10 | $3 00 | $11 49 |
| 1904 | 513 38 | 4 29 | 6 35 | 1 27 | 1 78 | 1 50 | 15 19 |
| 1905 | 1562 40 | 7 96 | 14 22 | 1 33 | 3 52 | 1 50 | 28 53 |
| 1906 | 1562 40 | 7 96 | 14 22 | | 3 52 | 1 50 | 27 00 |

Grand Total .. .,.. ...............................$82 21

The acts under which the assessment was made by the county court clerk for State and county taxes on prop-

erty or capital employed in Davidson county were chapter 128, p. 200, Acts of 1901, and chapter 257, p. 600, Acts of 1903, as follows:

"Sec. 3.   That all merchants shall pay an *ad valorem* tax upon the average capital invested by them in their business of fifty cents on the $100, thirty-five cents of which shall be for State purposes, and fifteen cents for school purposes; and a privilege tax of fifteen cents on each $100 worth of taxable property, 7½ cents of which shall be for school purposes and 7½ cents for State purposes:   Provided, that such privilege tax, without regard to the length of time they do business, shall in no case be less than $5, which $5 is to be paid when the license is taken out, and in case of those whose privilege tax amounts to more than $5, the $5 paid shall be a credit when the balance of the tax is paid; provided, further, that said $5 shall be equally divided between the State and counties."

See, also, chapter 174, p. 329, Acts of 1901, and chapter 258, p. 655, Acts of 1903, as follows:

"Sec. 27.   That merchants shall pay an *ad valorem* tax upon the capital invested in their business equal to that levied on taxable property.   The term 'merchant' as used in this act, includes all persons, copartnerships, or corporations engaged in trading or dealing in any kind of goods, wares, or merchandise, either on land or in steamboats, wharf boats, or other craft stationed or plying in the waters of this State, and confectioners, whether such goods, wares, or merchandise be kept on

hand for sale, or the same be purchased and delivered for profit as ordered."

We are of opinion that upon the facts stated this case comes within the principle of *American Steel & Wire Co.* v. *Speed,* 110 Tenn., 524, 75 S. W., 1037, 100 Am. St. Rep., 814, where it was held as follows:

"A foreign manufacturing corporation of another State, having an agent in this State to whom it ships its manufactured products, to be kept in stock in the agent's warehouses and to be used to fill contracts of sales made ·by its traveling salesmen or contracts made by certain intending purchasers by their depositing specifications of goods desired with the local agent who had no authority to so fix prices, but who had authority to deliver the goods so specified to certain local dealers previously designated by the said corporation, upon their filing such specifications, is a merchant dealing through such agency, in the meaning and sense of our statute (Acts 1901, c. 174, sec. 27) defining the term 'merchant' as including all persons, copartnerships, or corporations, engaged in trading or dealing in any kind of goods, wares, or merchandise, whether the same be kept on hand for sale or be purchased and delivered for profit as ordered, and taxable as a merchant under said statute providing that merchants shall pay an *ad valorem* tax upon the capital invested in their business, equal to that levied upon other taxable property."

In the midst of its opinion it was said:

"The vital fact is that the goods were not sold from

their place of manufacture, but were kept in stock at Memphis, and this stock was drawn on from time to time to fill contracts of sale made by the company's salesmen, or to fill contracts made by means of intending purchasers depositing specifications of goods desired with Patterson Transfer Company and in that manner obtaining the goods."

As already seen, the American Book Company is a New Jersey corporation, and ships text-books into the State of Tennessee, where they are kept on hand in certain designated depositories and sold to the school children of the State at prices regulated by statute, and which the company has the exclusive privilege to sell under its contract with the State.

It is therefore liable to a tax as a merchant doing business in this State, within the meaning of our statute, on the average value of its capital invested in the stock of merchandise kept on hand for sale, and also a privilege tax of fifteen cents on each $100 worth of taxable property. This is the law that applies to all other dealers in books in the State of Tennessee and to foreign manufacturers with agents in this State for the sale of their merchandise, and there is no law which would discriminate in favor of a publisher who is selling exclusively to the children of the State under a contract made with the State by which the prices are regulated and the text-books are made uniform.

It is said by counsel for the book company on the brief that this is "not a case in which an attempt is made to

117 Tenn.—49.

levy an *ad valorem* tax on the books which the company has at the Nashville depository, but is one in which it is sought to impose a privilege tax." In this contention counsel is evidently mistaken, for an analysis of the taxes assessed by the county court clerk against the American Book Company will show that the assessment embraced, first, an *ad valorem* tax on the stock of merchandise or average capital employed by said company in its business in this State, and also a privilege tax of fifteen cents on each $100 worth of taxable property. The *ad valorem* tax is assessed under the act of 1901 at the rate of fifty cents on each $100 of average capital or stock of merchandise employed in the business, thirty-five cents of which is assessed for State purposes and fifteen cents for school purposes.

In addition to that, the assessment shows that the minimum privilege tax of $5 equally divided between the State and county has also been laid on the business. These taxes were authorized by section 3, c. 128, Acts of 1901, and section 3, c. 257, Acts of 1903.

It being determined that the American Book Company is a merchant doing business in the State of Tennessee, within the definition of that term made by the legislature and interpreted by the adjudications of this court, it follows that it is liable to the payment both of *ad valorem* and privilege taxes. A merchant is liable to taxation on his stock of merchandise or capital invested in business according to its value, as all other property belonging to individuals is taxed. In addition to an *ad*

*valorem* tax, he is also liable to a privilege tax, or, as it is more accurately termed, a "merchant's tax." See *Jenkins* v. *Ewin,* 8 Heisk., 456; *Kelly* v. *Dwyer,* 7 Lea, 183.

We are therefore of opinion that the taxes were properly assessed and collected, and complainants are not entitled to recover the same back. The decree of the chancellor will therefore be reversed, and the bill dismissed, with costs.

Justice Wilkes dissents.